1
2
3
4
5
6
7
8                    IN THE UNITED STATES DISTRICT COURT
9              FOR THE EASTERN DISTRICT OF CALIFORNIA
10
11                                          | Case No. 1:14-cv-01214 LJO MJS (HC)
12   **JAMES E. WHITE,**
                                            **FINDINGS AND RECOMMENDATION**
13                          Petitioner,     **REGARDING PETITION FOR WRIT OF**
                                            **HABEAS CORPUS**
14           **v.**
15
16   **NEIL MCDOWELL, Warden,**
17                          Respondent.
18
19          Petitioner is a state prisoner proceeding *pro se* with a petition for writ of habeas
20   corpus pursuant to 28 U.S.C. § 2254.  Respondent, Neil McDowell, warden of Ironwood
21   State Prison, is hereby substituted as the proper named respondent pursuant to Rule
22   25(d) of the Federal Rules of Civil Procedure. Respondent is represented by Tami M.
23   Krenzin of the office of the Attorney General.
24   I.     **Procedural Background**
25          Petitioner is currently in the custody of the California Department of Corrections
26   pursuant to a judgment of the Superior Court of California, County of Merced, following
27   his conviction by jury trial on May 31, 2011, for first degree murder, felon in possession
28

of a firearm, and felon in possession of a prohibited weapon. (Clerk's Tr. at 628-31.) On

August 16, 2011, Petitioner was sentenced to an indeterminate term of twenty-five (25)

years to life. (Id.)

Petitioner filed a direct appeal with the California Court of Appeal, Fifth Appellate

District, which affirmed the judgment on April 16, 2013. (Lodged Docs. 1-4.) Petitioner

sought review from the California Supreme Court. (Lodged Docs. 5-6.) The California

Supreme Court denied review on July 17, 2013.

Petitioner did not file any collateral challenges to his conviction.

On August 4, 2014 Petitioner filed the instant federal habeas petition. (Pet., ECF

No. 1.) On May 31, 2016, Petitioner filed a second amended petition. (ECF No. 30.)

Petitioner presents three claims in the second amended petition: (1) that evidence of

vandalism of the victim's home should not have been admitted; (2) that the trial court

erred in admitting evidence of Petitioner's domestic violence prior offense; and (3) that

the prosecution committed misconduct by improperly arguing facts outside of evidence

during closing statements. (Id.)

Respondent filed an answer to the petition on March 30, 2016. (ECF No. 21.) As

the second amended petition was filed after Respondent's answer, Respondent was

provided an opportunity to amend his answer. Respondent notified the Court that

amendment of the answer was not necessary. (ECF No. 33.) The matter stands ready

for adjudication.

**II.    Statement of the Facts**[1]

FACTS

In 2002, Mauree Lashe Castle (Castle) met defendant, and they
started dating. In 2003, they moved into a house together in Merced.

In 2003 or 2004, Castle introduced defendant to Stephen Jackson.
Jackson and Castle were long-time family friends. Jackson was a former
college football player and worked as a carpenter and handyman. He was
described as a stout, muscular man.[fn2] Jackson had a son, Khalil, who

---

[1] The Fifth District Court of Appeal's summary of the facts in its April 16, 2013 opinion is presumed correct.
28 U.S.C. § 2254(e)(1).

had lived with Jackson since he was four years old, and they were very close.

FN2: The coroner testified that Jackson was five feet eight inches tall and weighed 226 pounds. Jackson's driver's license stated that he was six feet one inch tall and weighed 245 pounds.

Defendant and Jackson became friends. Defendant, known as "Pedro," occasionally worked for Jackson. Jackson and Khalil often saw defendant and Castle at family gatherings. Defendant and Jackson socialized, and Castle and Khalil testified they never saw any problems between them.[fn3]

FN3: By the time of trial, Khalil described defendant as his father's "ex-friend." Khalil was 11 years old when he saw defendant kill his father, and he was 16 years old when he testified. Khalil admitted he had been arrested for theft and the sale of marijuana. These incidents occurred after Jackson had been killed. Khalil testified he probably would not have committed those acts if his father had not been killed.

Defendant's relationship with Castle

Castle testified that in 2002, at the beginning of her relationship with defendant, they had a lot of fun together. However, the relationship subsequently became physically abusive. Castle testified that between 2003 and 2006, defendant was physically abusive toward her on four or five occasions. "It wasn't a constant thing. It didn't happen every day."[fn4]

FN4: In issue II, post, we will address defendant's contentions that the court improperly admitted the domestic violence evidence as relevant to motive, and that it should have excluded Castle's testimony as improper character evidence.

Castle testified that the first incident occurred in November 2003, after they had been at a friend's house and argued. As they walked to their car, defendant hit Castle. Castle hit him back, and defendant "continued to hit" her. He used an open hand, a closed fist, and also kicked her. Defendant slammed her hand into the car door. Castle did not call the police. Defendant later apologized, and Castle forgave him.

Castle testified the second incident occurred about a year later, and the third incident was six months after that. Defendant usually hit her in the face with a closed fist. She never called the police because she was afraid "he'd be much more upset and come after me even harder than the time before ...." Defendant threatened Castle, and told her that "wherever I went he would find me ...." Castle was afraid for herself and her daughter.

Castle testified about another incident when defendant was intoxicated, produced a gun, and placed it on her chest. Defendant said he loved her and he was not going to let her go. Castle left defendant three or four times, but she always returned.

Castle breaks up with defendant

Castle testified that she did not tell Jackson about defendant's physical abuse until late in 2006, just before she left defendant. Jackson

was concerned about her safety.

Castle testified that in November 2006, defendant was intoxicated and wanted to drive his car. Castle told him not to drive. Defendant became upset and hit Castle in her daughter's presence. That was "the last straw" for Castle, and she decided to leave defendant.

Castle testified that she waited to leave defendant until he was out of town, because she knew defendant would never let her leave. On that particular day, defendant went to Oakland with Jackson. Castle left Jackson a phone message about what she was going to do and asked him to let her know when they were going to return. Castle packed up her belongings, and her mother picked her up from defendant's house. Castle left a note for defendant, saying that she was leaving him. Later that day, Jackson sent Castle a text message that they were driving back from Oakland.

After Castle left Jackson, she lived with her mother in Merced. Defendant contacted her and was very upset. He wanted to reconcile, but Castle refused. Castle testified that defendant "wasn't trying to hear it" and insisted they could work things out. Defendant repeatedly called Castle and tried to reconcile.

Castle moves in with Jackson

In December 2006, Khalil was eleven years old and in the fourth grade. Jackson and Khalil lived in a mobile home in Merced. At that time, Jackson and Castle realized they had feelings for each other, and they began a dating relationship. Soon afterwards, Jackson proposed to Castle.

At some point in January 2007, Castle and her child moved into Jackson's mobile home. Khalil testified that Jackson and defendant were no longer friends once Jackson and Castle began their relationship.

Castle testified about an incident which occurred after she moved in with Jackson. Jackson and Castle were at the home of Jackson's mother in Merced. Defendant arrived and again asked to reconcile with Castle. Defendant asked Castle if she was sleeping with Jackson, and he became angry.

The gathering at defendant's house

Joseph Coney, Jr., was married to Jackson's sister. Coney knew defendant, Jackson and Castle. He also knew that Castle had left defendant and moved in with Jackson.

Coney testified that he attended a gathering at defendant's house when everyone was drinking beer.[fn5] Defendant was angry about Jackson. Defendant said that he felt like he wanted to kill Jackson. Defendant said he felt "like hiding by his mom's house and shooting him or something of that sort."

FN5: Coney testified this incident occurred before the vandalism at Jackson's mobile home, and before Jackson obtained the restraining order against defendant.

4

Coney did not take defendant's comment seriously. However, Coney told his wife (Jackson's sister) about defendant's comment.

Defendant's call; vandalism at Jackson's mobile home

On January 13, 2007, Jackson, Castle, and Khalil were in the San Francisco area. Castle testified that while they were out of town, she received a telephone call from defendant. Defendant was very angry and said his landlord had given him an eviction notice. Defendant blamed Castle and said it was her fault that he was being evicted. Defendant said that she "would pay for it."

When Jackson, Castle, and Khalil returned to the mobile home that night, they discovered that it had been vandalized. The windows were broken, the interior was "trashed," the television was broken, and several things were missing. Jackson's car had been parked there, and the windows were also broken.

Castle testified that she immediately felt defendant was responsible because Jackson and Castle did not have any enemies, and "[t]here was no one else who I could even think about that, you know, would have done that." Castle had previously heard that defendant "talked about vandalizing [Jackson's] car because I was using one of his cars ...."[fn6]

FN6: In issue I, post, we will address defendant's contentions that the court improperly allowed the prosecution to introduce evidence about the vandalism of the mobile home as relevant to motive.

Castle and Jackson filed a police report about the vandalism. Castle told the police that she thought defendant was responsible, because she had ended their relationship and defendant had made telephone threats about the eviction notice.

Castle testified that Jackson was upset about the vandalism and "wanted to take matters into his own hands, but he decided not to. He prayed about it." Jackson was concerned about Khalil's safety because the child was frightened. They moved out of the mobile home because it was not safe to stay there. Jackson and Castle continued to live together for a short period of time, and then Castle moved back to her mother's house.

The restraining order

On or about February 6, 2007, Castle filed a request in superior court for a restraining order to keep defendant away from Castle, Castle's mother, Castle's daughter, Jackson, and Khalil. The request was based Castle's declaration about the vandalism incident, her belief that defendant was responsible for the vandalism, defendant's telephone threats, and his prior acts of domestic violence. [fn7]

FN7: The prosecution introduced the application and the restraining order as an exhibit.

The court granted Castle's request, and a temporary restraining order was issued against defendant with a notice for defendant to respond

and appear for a hearing on further issuance of a restraining order.

At trial, Castle testified that she was frightened after the vandalism incident and believed defendant was responsible. Castle testified that she requested the restraining order as a result of the vandalism incident, to keep defendant away from Jackson, Khalil, Castle, and Castle's daughter. Khalil testified that he knew about the restraining order. Jackson never expressed any fear of defendant, but told Khalil to watch out and call him if anything happened.

Defendant complains and threatens Castle

Castle testified that shortly after the restraining order was issued, defendant saw her while he was driving. He stopped his car in the middle of the street and obstructed traffic. Defendant was upset and told Castle, "[O]h, you and [Jackson] got a restraining order on me ...." Defendant "kind of chased me around the car and he jumped back in [to his car] and drove off." Castle was frightened by the incident.

Castle testified about another incident when defendant called her and complained about the restraining order. Castle was in the grocery store when she received the call, and defendant said: "[B]itch you're dead ...."

The Wal-Mart incident and the text message

Joseph Coney, Jr., Jackson's brother-in-law, testified that he heard about the vandalism at Jackson's mobile home, and knew that Jackson and Castle believed defendant was responsible. Coney heard that Jackson had obtained a restraining order against defendant.

Coney testified that he also heard that defendant had a gun. Coney was concerned that the situation between defendant and Jackson was escalating. Coney told Jackson about defendant's prior statements, and that defendant had a gun. Jackson seemed to dismiss it.

In February 2007, Jackson and Khalil were driving out of Wal-Mart's parking lot. They passed defendant's white van as he traveled in the opposite traffic lane. Khalil thought defendant was about to make a turn, but instead defendant stopped in the middle of a busy intersection. Khalil testified that defendant held up the restraining order documents while he was still in his car. Defendant then got out of his car and walked up to the driver's side of Jackson's car. Defendant cursed at Jackson, and Jackson cursed back at him. Jackson stayed in the car. Jackson told defendant that they should go to the adjacent gas station and "get it on." Khalil thought they were going to fight, but defendant drove away. Jackson told Khalil not to worry and that everything would be okay.

Khalil testified that around the same time, Castle showed him a text message that Castle said she received from defendant. Khalil testified the text message threatened Castle, that he "wanted her head. He wanted to kill her."

**THE DAY OF THE HOMICIDE**

Around 1:00 p.m. on March 8, 2007, Shdari Crane was at defendant's house in Merced for a short period of time. Defendant and

Crane had been dating for a few months. Crane saw a small silver revolver on a master bedroom shelf. She picked it up and realized it was a real gun. Crane had never seen a weapon in defendant's house and asked him about it. Defendant said it was his gun, and that he carried it all the time.

On the afternoon of March 8, 2007, Jackson picked up Khalil from school and they went to the house of Jackson's mother in Merced. Jackson worked on a project at the house. Later in the afternoon, Jackson and Khalil drove to a nearby store to purchase parts. Jackson was driving a Suburban SUV.

Khalil testified that Jackson was driving on Highway 59 when they saw defendant driving a van in the opposite direction. Defendant swerved into Jackson's lane as if he was going to hit them head-on. Defendant then swerved back into his own lane and continued on his way. Jackson drove to the store, they purchased the parts, and then headed back to Jackson's mother's house.

Khalil testified that Jackson drove on Highway 59 and turned onto Cone Avenue. As Jackson made the turn, they saw defendant's van driving out of a mini-market. Jackson made a U-turn and drove back to defendant's van. Defendant stopped, cursed Jackson, and said, "[L]et's go finish this." Jackson and defendant exchanged curses, and they talked about fighting. Jackson pointed toward the mini-mart. Defendant disagreed about the mini-mart because there were cameras there. Defendant said: "'No, let's go over there to your mom's house.'" Jackson agreed and started to drive to his mother's nearby house. Khalil was worried that they were going to fight.

Khalil testified that during the encounter at the mini-mart, defendant raised his hand and gestured as if he was firing a gun. Khalil thought defendant meant he was going to shoot. He did not see defendant with a gun.

The fight

Khalil testified that Jackson was driving on Cone Avenue, heading for his family's house, when defendant's van drove in front of them and cut them off. Jackson had to hit his SUV's brakes to stop suddenly. Defendant's van stopped in the street at an angle, directly in front of Jackson's SUV.

Khalil testified that defendant got out of his van, left the driver's door open, and walked up to Jackson's SUV. Jackson got out of his SUV and closed his driver's door. Defendant was carrying a long, black baton, and hit Jackson in the forehead with it. Jackson tackled defendant, and defendant dropped the baton. Jackson got on top of defendant and punched him. Jackson and defendant were fighting toward the front of defendant's van, near the open driver's door.

Khalil testified that another man walked across the street and approached defendant and Jackson as they were fighting. The man looked right at them and said, "'Hey, stop fighting.'" Jackson continued to punch defendant as the unknown man stood near them.[fn8]

7

FN8: As we will explain, post, this man was later identified as Benito Aguirre, who lived in the area. Defendant testified at trial that Aguirre wrestled with him for the gun, and it accidentally discharged twice. However, Aguirre testified as a rebuttal witness for the prosecution, that he just told them to stop fighting, that he never touched the gun, and that defendant fired the gun at Jackson.

Khalil testified that defendant repeatedly asked Jackson to let him get up. Jackson finally stepped away, and defendant stood up.

<u>The fatal shooting</u>

Khalil had been watching the fight from inside Jackson's car. At some point, Khalil got out of the car and decided to run to his family's house for help. As he ran, he heard one gunshot. He looked back and saw defendant produce a gun and fire two shots into [Jackson]'s chest. "I seen [Jackson] on the ground and I heard the first shot, boom, I heard another one. My dad kind of stumbled. I seen him fall, and I just kept running, went to get [a neighbor for help]." Khalil had not seen defendant with a gun before he heard the shots."Q. [D]o you remember very clearly seeing this man [defendant] shoot your father twice?

"A. Yes."

Khalil knocked on a neighbor's door and asked for help. Khalil and the neighbor ran back to the scene of the fight. When Khalil and the neighbor returned to the scene, defendant had driven away.[fn9] Jackson was lying on the ground, and bleeding from his stomach and face. Khalil knew his father was badly hurt and tried to talk to him. Jackson told his son that it was going to be alright, and to stay in school and "do what you got to do."

FN9: At trial, Khalil insisted that defendant shot Jackson as Khalil ran for help. On the day of the homicide, however, Khalil told the police that defendant shot Jackson as Khalil ran back to the scene with the neighbor.

<u>Homicide witnesses</u>

Troy Edward Jones was the neighbor who Khalil asked for help. Jones was standing in his garage of his residence, located near the intersection of Cone Avenue and G Street, when he saw a van and a burgundy SUV traveling on Cone Avenue. The van pulled in front and cut off the SUV while the SUV was still moving. The two vehicles stopped, and the two drivers got out of their vehicles and started fighting. Jones thought one of the men briefly returned to the van during the fight.

Jones testified the fight was even until the van's driver produced a long, black stick. The van's driver hit the SUV's driver with the black stick. The SUV's driver fell to the ground and stayed there. Jones thought the van's driver reached under his shirt. Jones heard two gunshots, and saw the van's driver firing a gun toward the ground. Jones went into his house, called 911, and saw the van drive away from the scene.

As Jones was talking to the 911 operator, someone banged on his door. Jones opened the door and found Khalil, who was crying and hysterical, and said that his dad had been shot. Jones and Khalil rushed to

the scene. Khalil tried to help his father, but Jones held him back until the police arrived. Jones noticed that a bus and other vehicles had stopped on the street.

Ricardo Munoz was driving a county bus along his regular route on Cone Avenue toward G Street. He saw an SUV and white van stopped on the side of the street. Munoz testified that the van was parked at an angle in front of the SUV. Munoz testified that it appeared the van had cut off the SUV. The driver-side door of the van was open. There were two men fighting in the street. Munoz could not drive around the two vehicles, and he called his dispatcher to contact the police.

As Munoz waited in his bus, he watched the two men as they continued to fight. One man appeared to be getting the better of the fight, and he was on top of the other man as they wrestled on the ground. The first man stood up and started to walk away, and Munoz thought the fight was over.

Munoz testified that a crowd had gathered on the street. A man from the crowd appeared to briefly speak to the man who was already standing up. In the meantime, the man on the ground started to get up, but he did not appear to be a threat to the first man. The first man suddenly turned around and pointed a gun at the other man, and fired two shots at him from 8 to 10 feet away. Munoz did not know where the gunman obtained the weapon, and thought he could have walked to the van and reached into the open door.

Munoz thought the gunman's first shot was into the victim's stomach, because the victim bent forward as if he had been punched in the stomach. The gunman fired the second shot, the victim was hit again, and the victim fell back to the ground. The gunman looked into the bus, and Munoz feared for the safety of his bus passengers. The gunman got into the van and immediately left the area.

Jackson's death

At 4:42 p.m., Merced Police Officer Brian Rinder responded to the scene and saw the bus and several other vehicles stopped at the intersection. He found Stephen Jackson lying on the street. Jackson's eyes were open, and he was bleeding from his mouth and the left side of his head. Rinder opened Jackson's shirt and found a bullet wound in his chest. Jackson had no pulse, and he was not breathing. Rinder found an expandable black baton, also known as an "asp," about 10 to 20 feet from Jackson's body.

The paramedics arrived and attempted to treat Jackson. Jackson was transported to the hospital where he was pronounced dead.

Initial investigation

While the paramedics were treating Jackson, Officer Rinder spoke to Khalil at the scene. Khalil said that he was a passenger in his father's Suburban SUV. Jackson was driving on Cone Avenue near Highway 59 when he saw defendant driving a white van. Jackson turned and defendant followed them. Defendant pulled alongside of them, in the opposing traffic lane. Khalil said defendant held up his hand and moved

9

his finger as if he was firing a firearm. Khalil said defendant cut them off and made them stop near the G Street intersection.

Khalil told Officer Rinder that defendant got out of the white van and walked up to the driver's side of the Suburban, where Jackson was still seated. Defendant was holding the black baton. Jackson got out of the SUV, and Jackson and defendant started fighting in the street.

Khalil said he ran out of the SUV to a nearby house and asked someone to call 911. As Khalil ran back to the two vehicles, he saw defendant holding a silver or chrome-colored handgun. Defendant was standing over Jackson, who was on the ground, and he shot Jackson.

Pathology report

The pathologist determined that Jackson suffered two gunshot wounds, and recovered two .32-caliber bullets from Jackson's body. One bullet entered Jackson's upper right arm, exited through his right shoulder, re-entered his body through the right side of his neck, and lodged in his temple and under the scalp. The other bullet entered Jackson's chest and traveled in a straight line, front to back, at a 25-degree angle. It went through his heart and aorta and lodged in his spine. The gunshot to the chest inflicted fatal wounds, and Jackson would have died within seconds.

The pathologist believed the gunman could have been at least 18 inches away from Jackson when he fired. The pathologist could not determine which gunshot had been fired first. If the first shot had been into the chest, Jackson could have leaned forward in reaction to it, as if he had been punched in the chest. Jackson could have taken a few steps, tried to run, screamed or talked, and then collapsed; he would have died within 30 seconds. The gunshot which inflicted the shoulder/head/neck wounds could have been inflicted when Jackson was lying on the ground.

Jackson also suffered minor abrasions on his knees, torso, knuckles, and the back of his hands. These abrasions were consistent with someone hitting Jackson with an asp, or Jackson hitting someone, falling on the asphalt, and/or rolling around during an altercation. Jackson had an abrasion on his head, which could have been inflicted by an object hitting his head. Jackson was not under the influence of drugs or alcohol when he died.

The search for defendant

Defendant was the only suspect and fled the scene. On the morning of Saturday, March 10, 2007, defendant's white van was found in Stockton.

On or about March 11, 2007, defendant called Shdari Crane. Crane encouraged defendant to turn himself in. Defendant said he was going to do so.

On Monday, March 12, 2007, defendant turned himself in to the police at Highland Hospital in Oakland. The homicide weapon was never located.

Domestic violence expert

Detective Raquel Rios, a domestic violence investigator with the Merced Police Department, testified for the prosecution as an expert on domestic violence.[fn10]

FN10: In issue II, post, we will address defendant's contentions that Rios's testimony constituted inadmissible character and profile evidence.

Detective Rios testified about the cycle of violence in an intimate relationship, the various stages, and misconceptions about domestic violence situations.

Detective Rios testified that power and control play a role in an abusive relationship. The abusive partner may use both physical violence and emotional intimidation. An abused partner may not be able to leave the relationship because of financial dependence on the abuser, and the abused partner may also be afraid that the abuser's threats will become more volatile upon leaving.

Detective Rios testified while domestic violence is typically displayed from one partner toward the other partner, it can also extend to the other partner's child, parent, friend, or someone helping out that person. The abusive partner may direct his or her actions at other people to hurt the abused victim. "They ultimately could be put at risk because of the mere fact they've been helping them. And, I mean, there is a lot more followed up by that, of course, if there is other incidents that have clearly shown that's going to happen."

The prosecutor asked Detective Rios about the following hypothetical situation:"[T]here is a woman that was in an abusive relationship for approximately three years. She had tried to leave on a couple of occasions, and she attempted to leave, her abuser would threaten her. When she finally leaves — she was finally able to leave. She was assisted by a male friend of hers. Soon after that the male friend and her started dating and her abuser started threatening both of them. If I told you that the abuser was confronting the male friend would you have an opinion as to why that was occurring?"

Detective Rios replied that it depended on how many times the person confronted the victim and what actions occurred. The prosecutor asked Rios to assume the facts and circumstances from the police reports about Castle and Jackson. Rios testified that in her opinion, based on the history of domestic violence and subsequent threats, Jackson "was being stalked as much as Ms. Castle was" because of Jackson's relationship with Castle.

On cross-examination, defense counsel asked to assume further facts in the hypothetical, that the old and new boyfriends had known each other. Detective Rios conceded that the old boyfriend may have simply been angry at the new boyfriend because he ran off with his girlfriend, since the men had been friends.

**DEFENSE EVIDENCE**

Angela Romero[fn11] testified that on the afternoon of the homicide, she was at the home of Benito "Benny" Aguirre (Aguirre),

located near the intersection of Cone Avenue and G Street.

FN11: Romero admitted she had misdemeanor convictions in 2005 and 2007 for petty theft and unlawfully taking or driving a vehicle.

Romero testified that she saw the van and the SUV parked on the side of the road. The two vehicles were lined up straight, one in front of the other. Romero insisted that the van had not cut off the SUV. The van's door was ajar. The bus was behind the SUV.

Romero saw two men fighting near the van's open door. The men were punching each other. She recognized Jackson, and he was on top of defendant. Jackson was punching and beating defendant, and Jackson was winning the fight. Defendant's back was against the van's open door, and he was trapped between the van and the open door while Jackson was beating him.

Romero testified that Aguirre crossed the street and approached the two men. Aguirre told them to "knock it off" and stop fighting. Jackson slowly got up and backed away from defendant.

Romero testified that something "silver-ish" fell out of defendant's pocket. Aguirre turned around and said, "'[H]e's got a gun,'" and ran away from the two men. Romero did not see any weapon.

Romero testified that she rushed back into Aguirre's house and did not see the actual shooting. She heard gunshots, turned around, and saw Jackson on the ground. Defendant jumped into the van and left.

On cross-examination, Romero conceded that she had previously told the police that she saw Jackson get shot while he was lying on the ground. Romero also conceded that she previously said that "'all of a sudden the guy was over [Jackson] and he just pow, pow, pow, pow ....'"[fn12]

FN12: Romero admitted that her son was incarcerated in the main jail at the time of the trial. Romero testified that in the weeks prior to the start of the trial, she told a member of Jackson's family that she was afraid to testify because she felt it could endanger her son.

**DEFENDANT'S TRIAL TESTIMONY**

Defendant testified at trial about his relationships with Castle and Jackson, and the homicide. His account was vastly different from the testimony of the prosecution witnesses.

Defendant denied that he hit or threatened Castle during their relationship and testified that Castle lied about all the domestic violence incidents. Defendant insisted that Castle would have filed some type of report if she had been beaten.

Defendant testified that he had relationships with other women while he was living with Castle and fathered a child with another woman. Defendant told Castle about these relationships, and they did not have any problems. Defendant further testified that Castle was also seeing

other people.

Defendant testified that in November 2006, Jackson asked him to go to Oakland with him. When he returned to Merced, he discovered Castle had left him. However, Castle returned about one week later and gave him an ultimatum to stop seeing other women. Defendant said no and continued to see other women.

A few weeks later, Castle again left defendant. Defendant denied that Castle left him because he was an abusive bully. Defendant was not angry that she left. However, Castle used to contribute to the rent on defendant's house, and he was concerned about how he was going to pay by himself. Defendant concluded that he would have to "do a little more hustling" and sell "a lot of weed" to make rent. After Castle left him, defendant dated Shdari Crane and described their relationship as being "sex buddies."

The vandalism

In January 2007, defendant's landlord advised him that Castle's name had been removed from the rental agreement, he owed $3,000 in back rent, and he had to move out by March. Defendant was surprised and called Castle about it, but she hung up. Defendant was upset about the rent issue.

Defendant learned that Castle was living with Jackson, but testified that he was not angry or jealous about it. However, defendant did not think it was "right" for Jackson and Castle to have a relationship because Jackson's son and Castle's daughter were cousins. [fn13]

FN13: Castle had a daughter; that child's father was the brother of Khalil's mother.

Defendant heard from mutual friends that Jackson blamed him for the vandalism of his residence. A friend dropped off defendant at the home of Jackson's mother, and defendant talked to Jackson about the vandalism. Defendant told him that he did not do it and asked Jackson to stop accusing him of it. Jackson told defendant that a red SUV was seen near the mobile home at the time of the vandalism. Defendant replied that he did not own a red truck. Jackson mentioned that defendant could have borrowed a mutual friend's red Cadillac Escalade SUV. Defendant admitted that he had borrowed the friend's red Escalade for 15 to 20 minutes on the day of the vandalism, but claimed he only used it to conduct a marijuana transaction in an alley.[fn14]

FN14: Defendant testified he was allowed to smoke marijuana because he had a "medical marijuana card" for a job-related back injury. Defendant admitted he also sold marijuana in Merced; that he carried a firearm when he sold drugs; that he was an ex-felon; that he knew the medical marijuana card did not allow him to sell drugs; and he knew he was committing a crime by selling drugs and carrying a weapon.

During that same visit, defendant also spoke to Castle about the overdue rent. Castle told defendant not to worry about it, that she would pay it, and to leave her alone. Defendant testified that he was only angry because Castle had failed to pay his landlord.

13

Defendant testified that everyone in Jackson's family blamed him for the vandalism and it hurt him "[d]eeply" because they had all been friends. However, defendant felt everything was "good" with Jackson after their conversation, and Jackson drove defendant back to his house.

The restraining order

Defendant testified that the police served him with a restraining order a few weeks later. Defendant was angry because none of the abuse or vandalism allegations were true.

Defendant testified that he saw Jackson at an intersection, stopped at the light, and asked him about the restraining order. Jackson told defendant to go about his business. Defendant admitted he briefly stepped out of his car and acknowledged that conduct violated the restraining order. Defendant drove away when the light turned green.

Defendant's gun and asp

Defendant testified that about a month before the homicide, he obtained a small, chrome-colored .32-caliber Derringer. He bought the gun and an asp from "a guy in an alley" to have protection, even though he thought things were "cool" with Jackson. He did so because a friend had told defendant that Jackson was asking around for a gun. Defendant began carrying both weapons with him, even though he knew that as a felon he could not possess a firearm.[fn15]

FN15: Defendant admitted that he had prior felony convictions in 1992 and 1993, including one for evading the police, and he knew that he could not possess a firearm.

Defendant testified that Joseph Coney lied when he testified that defendant said he was angry about Jackson and Castle, and that he wanted to kill Jackson. Defendant denied leaving any threatening messages for Castle after they separated.

The day of the homicide

Defendant testified that while Shdari Crane visited him several hours before the homicide, she lied when she claimed to have seen a gun because the weapon was hidden in a dresser drawer that day. However, defendant admitted that Crane had previously seen the gun and asp when he visited her house.

Defendant testified he was carrying his gun when he left his house on March 8, 2007. Later that day, defendant went to family court and filed his response to the restraining order. Defendant left the gun in the van when he went into the courthouse. When he returned to his van, he put his gun in his pocket. He went to a friend's house and they smoked marijuana. He later gave a ride to the friends' nieces and dropped them off at a house near Jackson's mother. Defendant denied that he went into that neighborhood to look for Jackson.[fn16]

FN16: Jacqueline Hill testified that defendant gave her and her sister a ride that afternoon. Louwanna Vaughn, their mother, testified that

14

defendant dropped off Hill and her sister at her house around 4:00 p.m. Vaughn lived near Cone Avenue and G Street. Anywhere from 10 to 30 minutes later, Vaughn and Hill heard gunfire. Vaughn looked outside and just saw a crowd of people.

A police detective testified that he interviewed Vaughn on the day of the homicide because she lived in the neighborhood. Vaughn stated that she heard a couple of gunshots and then heard an engine "rev" and tires "burn rubber." However, Vaughn said she was home alone when she heard the gunshots; she never said her daughters were also home.

Defendant testified that he drove to a gas station and passed Jackson as he was driving in the opposite direction. Defendant denied that he was looking for Jackson or that he was angry about the restraining order. Defendant turned onto Cone Avenue, and Jackson turned behind him. Defendant stopped at the intersection to turn. Jackson was following him and did not pass on the side. Defendant admitted that he stopped in the middle of the street and "just bounced out" of his van to talk to Jackson about the restraining order. Defendant knew the restraining order was still in effect, it protected both Jackson and Khalil, and Khalil was in the car, but he still decided to violate the order and talk to Jackson.

Defendant disputed Khalil's account that defendant and Jackson spoke at the mini-mart, or that defendant gestured his hand like he was firing a gun. Defendant also denied that he said they should not go to the mini-mart because there were cameras there, or suggested they should go to Jackson's mother's house. When asked why he stopped in the middle of the intersection, defendant testified that he "felt like we could have that conversation right" there at the corner, instead of following Jackson to his mother's house.

The fight

Defendant denied that he cut off Jackson's SUV and disputed the testimony of the witnesses at the scene, that the van was parked at an angle in front of the SUV.

Defendant admitted that when he got out of the van to speak to Jackson, he had both the asp and gun in his pocket. Defendant insisted that he did not intend to fight with Jackson. Defendant testified that Khalil was wrong when he said that defendant was holding the asp when he got out of his van.

Defendant testified that Jackson got out of his vehicle, and they cursed and argued. Jackson punched him in the jaw. Defendant fell down and Jackson moved toward him. Defendant reached in his pocket for the asp and swung it at Jackson. Jackson blocked the asp with his arm, and it fell to the ground.

Defendant testified that Jackson grabbed his waist, tackled him, and pushed him back to the van. Defendant fell into the van's open doorway, and defendant thought he suffered a broken rib. Jackson threw a couple of punches. Defendant was able to push Jackson away. Defendant tried to get into his van, but Jackson grabbed him again. Defendant "bounced" against the van, and they fell into the street. Jackson punched defendant in the head while defendant was lying on his back. Defendant

kicked Jackson, and he stumbled backwards.

The homicide

Defendant testified that he saw the asp lying on the street and started to crawl toward it. He also saw his gun on the ground. He picked up the gun because he did not want anyone else to have it. Defendant did not want to shoot Jackson. Jackson was about eight feet away from him. Defendant held the gun in his left hand, against his body.

Defendant testified that "[a]ll of a sudden some guy just come out of nowhere and try to take the gun from me and the gun went off." Defendant did not know this man, who was later identified as Aguirre. Defendant testified that Aguirre held defendant's hand and wrist, and the gun discharged. Jackson had been leaning slightly forward. Jackson "kind of turned," and defendant thought he was hit in the shoulder. Defendant testified that he was still on the ground, and he continued to struggle with Aguirre for control of the gun. The gun "went off again" and fell to the ground. Jackson stumbled to his knees and then fell in the street. Aguirre ran away into the neighborhood.

Defendant testified that the shooting was an accident, and he did not shoot Jackson out of fear, self-defense, or heat of passion over his relationship with Castle. Defendant testified the gun went off because Aguirre wrestled with him for the gun.

Defendant testified that Munoz, the bus driver, was wrong when he said that Aguirre left the area prior to the gunshots being fired. Defendant also insisted the bus driver was wrong when he testified that defendant pointed the gun at Jackson's prone body and fired twice.

Defendant testified that after the two gunshots were fired, he picked up the gun, panicked, and left the scene. Defendant threw the gun on the freeway, drove to Stockton, met a friend there, and abandoned his van. Defendant got rid of the gun because "[t]here was no need" for it anymore. Defendant went to Oakland and turned himself in to the police.

Defendant insisted the shooting was an accident, and he never tried to kill Jackson. He ran away because he panicked. Defendant admitted that it took five days until he turned himself in, even though it was an accident. Defendant denied that he told anyone that he shot Jackson in self-defense.

Defendant testified that he did not bear any responsibility for Jackson's death."[THE PROSECUTOR]. ... So if you, Mr. White, the felon, hadn't shown up with a firearm that you were not supposed to own or possess, would [Jackson] be here today?

"A. Yes.

"Q. But you don't have any responsibility for his death?

"A. Yes, I have responsibility for his death.

"Q. All right. Which is it, sir, cuz [sic] you told us both.

"A. If [Aguirre] wouldn't have tried to take the gun [Jackson] would still be here today.

"Q. Ah. Not if you hadn't shown up with a firearm [Jackson] would still be here. If a good samaritan hadn't come and tried to breakup a fight [Jackson] would be here today?

"A. Exactly."

**REBUTTAL**

The prosecutor recalled Shdari Crane as a rebuttal witness. Crane testified she maintained contact with defendant after he was arrested and talked to him in jail by telephone. She mentioned the homicide and defendant "just kept saying it was self-defense." Defendant never said that Jackson was accidentally shot.

The prosecutor also called Benny Aguirre as a rebuttal witness. Aguirre identified himself as the neighborhood bystander who tried to approach defendant and Jackson as they were fighting, as described by Khalil, Munoz (the bus driver), and even defendant. However, he categorically disputed defendant's claim that he wrestled with defendant for the gun, or that he was responsible for discharging the fatal gunshot into Jackson's body.

Aguirre testified that he lived with his girlfriend, Ashley Brown, on Cone Avenue. He heard the sounds of tires squealing and brakes slamming and looked outside. He saw two men getting out of their cars. Aguirre recognized Jackson, but he did not know defendant.

Aguirre testified that defendant got out of his car and was carrying an object that looked like a stick. Defendant swung the stick at Jackson. Jackson blocked the stick, and it flew away. Jackson started "smashing" at defendant and "socked" him. Jackson "whipped his ass."

Jackson took defendant down to the ground, and several items fell out of defendant's pockets. Aguirre was about 20 feet away. He saw a "small chrome thing" on the ground, and thought it could have been a knife, "a knuckle thing," or some type of "fighting object."

Defendant and Jackson continued to fight on the street. Aguirre thought defendant was "going for" the small chrome thing. Aguirre was not going to break up the fight, but he wanted to kick the shiny object out of the way to prevent the situation from escalating.

Aguirre walked toward the two men and tried to kick the shiny object away. Defendant crawled toward it faster and reached the object before Aguirre. Defendant picked it up, and Aguirre realized it was a gun. Aguirre never reached for or touched the gun.

Aguirre testified that defendant pointed the gun at Aguirre. Aguirre became frightened and yelled, "Gun, gun." As defendant pointed the gun at Aguirre, Jackson was getting up from the ground. Jackson was about four to six feet away from defendant and backing away from him. Aguirre started to back away from defendant as he aimed the gun at him.

1
2
3

        Aguirre testified that defendant turned the gun away from Aquirre, pointed the gun at Jackson, and fired it at Jackson. Aguirre thought defendant fired two or three shots at Jackson, and that the shots hit Jackson in the eye and chest. Aguirre testified that after defendant fired the shots, he jumped into the van and took off.

4
5

        Aguirre testified that he never got closer than three feet from the gun. Aguirre never touched or fired the gun, and he never wrestled with defendant for control of the gun. Aguirre did not feel responsible for Jackson's death or fear that he would be charged in the case.

6    People v. White, 2013 Cal. App. Unpub. LEXIS 2670, 3-39 (Cal. App. 2013).

7    **III.   Discussion**

8        **A.   Jurisdiction**

9        Relief by way of a petition for writ of habeas corpus extends to a person in

10   custody pursuant to the judgment of a state court if the custody is in violation of the

11   Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. §

12   2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he

13   suffered violations of his rights as guaranteed by the U.S. Constitution.  (Pet.)  In

14   addition, the conviction challenged arises out of the Merced County Superior Court,

15   which is located within the jurisdiction of this court. 28 U.S.C. § 2241(d); 2254(a).

16   Accordingly, this Court has jurisdiction over the instant action.

17        **B.   Legal Standard of Review**

18        On April 24, 1996, Congress enacted the Antiterrorism and Effective Death

19   Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus

20   filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood,

21   114 F.3d 1484, 1499 (9th Cir. 1997).  The instant petition was filed after the enactment

22   of the AEDPA and is therefore governed by AEDPA provisions.

23        Under AEDPA, a person in custody under a judgment of a state court may only be

24   granted a writ of habeas corpus for violations of the Constitution or laws of the United

25   States.  28 U.S.C. § 2254(a); Williams, 529 U.S. at 375 n. 7.  Federal habeas corpus

26   relief is available for any claim decided on the merits in state court proceedings if the

27   state court's adjudication of the claim:

28        (1)   resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

### 1. Contrary to or an Unreasonable Application of Federal Law

A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that [are] materially indistinguishable from [a Supreme Court case] but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-06). "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied . . . The statute recognizes . . . that even a general standard may be applied in an unreasonable manner." Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted). The "clearly established Federal law" requirement "does not demand more than a 'principle' or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009). For a state decision to be an unreasonable application of clearly established federal law under § 2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle (or principles) to the issue before the state court. Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003). A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." Id. at 75-76 (quoting Williams, 529 U.S. at 409-10); Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). In Harrington v. Richter, the Court further stresses that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." 131 S. Ct. 770, 785 (2011) (citing Williams, 529 U.S. at 410) (emphasis in original). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786 (citing Yarborough v. Alvarado, 541 U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts have in reading outcomes in case-by-case determinations." Id.; Renico v. Lett, 130 S.

19

Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 129 S. Ct. 1411, 1419 (2009) (quoted by Richter, 131 S. Ct. at 786).

## 2. Review of State Decisions

"Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the claim rest on the same grounds." See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991). This is referred to as the "look through" presumption. Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198 (9th Cir. 2006). Determining whether a state court's decision resulted from an unreasonable legal or factual conclusion, "does not require that there be an opinion from the state court explaining the state court's reasoning." Richter, 131 S. Ct. at 784-85. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Id. "This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" Id.

Richter instructs that whether the state court decision is reasoned and explained, or merely a summary denial, the approach to evaluating unreasonableness under § 2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at 786. Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. at 75). AEDPA "preserves authority to issue the writ in cases where there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." Id. (emphasis added). To put it yet another way:

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Id. at 786-87.  The Court then explains the rationale for this rule, i.e., "that state courts are the principal forum for asserting constitutional challenges to state convictions." Id. at 787.  It follows from this consideration that § 2254(d) "complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for later federal habeas proceedings." Id. (citing Wainwright v. Sykes, 433 U.S. 72, 90 (1977)).

### 3.    Prejudicial Impact of Constitutional Error

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).  Some constitutional errors, however, do not require that the petitioner demonstrate prejudice.  See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984).

## IV.    Review of Petition

### A.    Claim 1 – Procedural Default

Respondent asserts Petitioner's first claim is subject to procedural default. Petitioner presented the claim in his direct appeals before the California Court of Appeal and Supreme Court. (Lodged Docs. 1-6.) Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n.3 (1991).

The state court denied the petition based on a state procedural bar. However, it also addressed the challenge to the evidence under state law. With regard to Petitioner's

evidentiary challenges based on federal law, the court explained:

> Finally, defendant contends that the admission of the vandalism evidence violated his federal constitutional due process rights. We note that defendant did not raise this objection at trial and has waived it. (Barnett, supra, 17 Cal.4th at p. 1119, fn. 54.) We further note that a defendant's federal due process rights are not implicated when, as is so in this case, the disputed evidence is relevant, material, and admissible on the grounds provided for in section 1101, subdivision (b). (People v. Catlin (2001) 26 Cal.4th 81, 123.)

People v. White, 2013 Cal. App. Unpub. LEXIS 2670 at 39-52.

Based on the cases cited by the California courts, it appears that the federal claim was procedurally barred for failure to object to the object to the evidence based on federal grounds to preserve the right to present the same challenge on appeal. See People v. Ashmus, 54 Cal. 3d 932, 972 n.10 (1991) (The general rule is "that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal.")

### 1.    Legal Framework for Procedural Default

The Supreme Court recently described the legal requirements that prevent review of claims that were rejected on state court grounds:

> "A federal habeas court will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.' " Kindler, 558 U.S., at 55, 130 S.Ct., at 615 (quoting Coleman v. Thompson, 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)). The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits. See Sykes, 433 U.S., at 81-82, 90, 97 S.Ct. 2497.
>
> ***
>
> To qualify as an "adequate" procedural ground, a state rule must be "firmly established and regularly followed." Kindler, 558 U.S., at 60, 130 S.Ct., at 618 (internal quotation marks omitted). FN4 [omitted] "[A] discretionary state procedural rule," we held in Kindler, "can serve as an adequate ground to bar federal habeas review." Ibid. A "rule can be 'firmly established' and 'regularly followed,'" Kindler observed, "even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." Ibid. California's time rule, although discretionary, meets the "firmly established" criterion, as Kindler comprehended that requirement.

1  Walker v. Martin,   U.S.   , 131 S. Ct. 1120, 1127-1128, 179 L. Ed. 2d 62 (2011)

2  (abrogating Townsend v. Knowles, 562 F.3d 1200 (9th Cir. 2009)).

3      Respondent contends that Petitioner's claim is barred by the procedural default

4  doctrine as stated in Coleman v. Thompson, 501 U.S. 722, 111 S. Ct. 2546, 115 L. Ed.

5  2d 640 (1991). Coleman bars review of a petitioner's federal habeas claim when the

6  claim was rejected in state court based on an adequate and independent state

7  procedural bar. Id. at 729-30.

8          In all cases in which a state prisoner has defaulted his federal claims in
           state court pursuant to an independent and adequate state procedural
9          rule, federal habeas review of the claims is barred unless the prisoner can
           demonstrate cause for the default and actual prejudice as a result of the
10         alleged violation of federal law, or demonstrate that failure to consider the
           claims will result in a fundamental miscarriage of justice.
11

12  Id. at 750.

13      A procedural bar must have risen from explicit and independent state law. Id. at

14  735; Harris v. Reed, 489 U.S. 255, 265, 109 S. Ct. 1038, 103 L. Ed. 2d 308 (1988). For

15  the procedural bar to be adequate, the bar must be clear, consistently applied, and well

16  established at the time of the alleged default. Collier v. Bayer, 408 F.3d 1279, 1284 (9th

17  Cir. 2005). Also, the opinion of the last state court rendering a judgment in the case must

18  clearly and expressly state that its judgment rests on a state procedural bar. Harris, 489

19  U.S. at 263; see Coleman, 501 U.S. at 729-30.

20      This claim is procedurally defaulted. Petitioner makes no challenge to the

21  adequacy of the contemporaneous objection rule. Reviewing the record, Petitioner's

22  counsel failed to raise any objections to the evidence based on Federal law. (Rep. Tr. at

23  46-48.)

24      Even if he had, it would have been difficult to overcome the decades-long case

25  history upholding the adequacy of this particular procedural default. The Ninth Circuit

26  has recognized and applied California's contemporaneous objection rule, section 353 of

27  the California Evidence Code.[2]  That rule provides that a criminal defendant must make

28      [2] The text of the statute reads as follows:

                                              (continued...)

1  a timely objection to the admission of evidence at trial in order to preserve a claim

2  challenging that evidence on appeal. Evidence Code 353 states that the defendant must

3  "make clear the specific ground of the objection or motion" and, the California Supreme

4  Court has routinely applied the rule to situations where the defendant raised state law

5  evidentiary claims at trial, but did not raise the federal evidentiary challenges raised on

6  appeal. See People v. Barnett, 17 Cal. 4th 1044, 1119 n.54 (1998); People v. Rodrigues,

7  8 Cal. 4th 1060, 1116 n.20 (1994); People v. Ashmus, 54 Cal. 3d 932, 972 n.10 (1991);

8  People v. Benson, 52 Cal. 3d 754, 786 n.7 (1990).

9  In addition to being applied by California courts to deny relief on appeal, Federal

10  courts likewise have found the contemporaneous objection rule as a basis for denying a

11  federal habeas corpus claim under the doctrine of procedural default where there was a

12  failure to object on federal grounds at trial. See, e.g., Fairbank v. Ayers, 650 F.3d 1243,

13  1256 (9th Cir. 2011); Inthavong v. Lamarque, 420 F.3d 1055, 1058 (9th Cir.2005);

14  Paulino v. Castro, 371 F.3d 1083, 1092-1093 (9th Cir.2004); Melendez v. Pliler, 288

15  F.3d 1120, 1125 (9th Cir.2002) (citing Garrison v. McCarthy, 653 F.2d 374, 377 (9th

16  Cir.1981)); Vansickel v. White, 166 F.3d 953, 957 (9th Cir. 1999); Bonin v. Calderon, 59

17  F.3d 815, 842-843 (9th Cir.1995). See also MacDonald v. Paramo, 2016 U.S. Dist.

18  LEXIS 56261, 2016 WL 1670524 (E.D. Cal. 2016).

19  Having found that a procedural bar exists, the Court must determine if the state

20  procedural bar was adequate and independent. Coleman v. Thompson, 501 U.S. at 29-

21  30. The Ninth Circuit uses a burden-shifting analysis to determine adequacy. Bennett v.

22  _____

23  (…continued)

24  A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be
reversed, by reason of the erroneous admission of evidence unless:

25
26  (a) There appears of record an objection to or a motion to exclude or to strike the evidence that
was timely made and so stated as to make clear the specific ground of the objection or motion; and

27  (b) The court which passes on the effect of the error or errors is of the opinion that the admitted
evidence should have been excluded on the ground stated and that the error or errors complained of
28  resulted in a miscarriage of justice.

24

1  Mueller, 322 F.3d 573, 585-586 (9th Cir. 2003). Under this analysis, when the state

2  pleads, as an affirmative defense, that a claim is procedurally barred, the burden shifts to

3  the petitioner to challenge the adequacy of that bar by showing that it has been

4  inconsistently applied. Id. Where the petitioner challenges the adequacy of the bar, the

5  state retains the ultimate burden of proving adequacy. Id.

6      Respondent argues that the contemporaneous objection rule in question is an

7  explicit and independent state law. The opinion of the last state court rendering

8  judgment, the Fifth District Court of Appeal, citing California Supreme Court case law,

9  stating that Petitioner's failure to preserve his challenge was grounds to deny his claim.

10     In this case, Petitioner provides no response to the procedural bar asserted by

11  Respondent and therefore fails to meet his burden of shifting the burden back to

12  Respondent. See King v. LaMarque, 464 F.3d 963, 967 (9th Cir. 2006) ("Bennett

13  requires the petitioner to 'place [the procedural default] defense in issue" to shift the

14  burden back to the government"). It should also be noted that when challenged, federal

15  courts have questioned whether the contemporaneous objection rule is consistently

16  applied and well established. See e.g., Steele v. Ayers, 2010 U.S. Dist. LEXIS 70731

17  (E.D. Cal. July 14, 2010) (failing to rely on other federal courts review of procedural

18  default based on the contemporaneous objection rule due to the lack of review of

19  whether the bar is consistently applied). However, in light of recent Supreme Court

20  authority, even if not applied entirely consistently, a state rule can be considered

21  consistently applied. See Walker v. Martin, 131 S. Ct. 1120, 1128, 179 L. Ed. 2d 62

22  (2011) ("A discretionary state procedural rule ... can serve as an adequate ground to bar

23  federal habeas review. A rule can be firmly established and regularly followed even if the

24  appropriate exercise of discretion may permit consideration of a federal claim in some

25  cases but not others.") (citations and internal quotations omitted). Petitioner has not

26  provided any evidence to establish that contemporaneous objection rule was not

27  consistently applied. The Court finds that Petitioner has not met his burden of

28  challenging the procedural default and his claim is barred from federal review.

To overcome a procedural default a prisoner must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750. "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him: '[W]e think that the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" Id. at 753 (citing Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986)).

## 2. Reasons to Overcome Procedural Default

Even when a federal claim has been procedurally defaulted, "[t]he bar to federal review may be lifted, if 'the prisoner can demonstrate cause for the [procedural] default [in state court] and actual prejudice as a result of the alleged violation of federal law.' " Maples v. Thomas, 132 S.Ct. 912, 922, 181 L. Ed. 2d 807 (2012) (quoting Coleman, 501 U.S. at 750, 746-47); see also Schneider v. McDaniel, 674 F.3d 1144, 1153 (9th Cir. 2012). Adequate "cause" for a default must be an "external" factor that cannot fairly be attributed to the petitioner. Coleman, 501 US. at 753.

### a. Cause

In Coleman, the court noted that attorney error which rises to the level of ineffective assistance of counsel is considered "cause" within the meaning of this rule. Coleman, 501 U.S. at 753-54. This is because a defendant has a right to effective assistance of counsel under the Sixth Amendment, and a violation of that must be seen as an external factor, and thus the error must be imputed to the state. Id.; Murray, 477 U.S. at 488. Here, Petitioner has alleged that the court improperly allowed character evidence to be admitted in the form of Petitioner past uncharged criminal conduct. The Court shall assume, without deciding, that Petitioner has shown cause for the procedural default.

### b.    Prejudice

In addition to cause, prejudice is a required element for Petitioner to overcome a procedural bar. In order to establish prejudice to overcome a procedural default, Petitioner must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." See United States v. Frady, 456 U.S. 152, 170, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982) (discussing prejudice where defendant failed to object to jury instructions in proceeding under 28 U.S.C. § 2255); Schneider v. McDaniel, 674 F.3d 1144, 1153 (9th Cir. 2012). "Prejudice [to excuse a procedural default] is actual harm resulting from the alleged error." Vickers v. Stewart, 144 F.3d 613, 617 (9th Cir. 1998).

To assist in determining prejudice, the Court will review the state Court's determination regarding the relevant evidence:

> In this case, as in Barnett, the court properly allowed Castle and Khalil to testify that they believed — along with Jackson — that defendant was responsible for the vandalism of Jackson's trailer. The prosecution witnesses explained that defendant and Jackson had been friends, they worked together, they frequently socialized, and they never had any problems between them. Their relationship changed when Castle left defendant and moved in with Jackson. Their relationship deteriorated after the vandalism incident because Jackson and Castle believed defendant was responsible. Indeed, the vandalism of Jackson's mobile home was a vital fact for the violent tragedy that unfolded in this case. Castle testified that defendant called her when she was out of town with Jackson, and he was very angry because he was about to be evicted from the house they had shared since Castle had stopped paying rent. Defendant told Castle that she "would pay for it."
>
> When Castle and Jackson returned to the mobile home that night, they discovered it had been vandalized and burglarized, and they believed defendant was responsible. Their belief was based on defendant's angry and threatening words during the telephone call, which had occurred earlier that day.
>
> We note the prosecution's offer of proof for this evidence was partially based on Castle's testimony that a certain type of SUV was seen near the mobile home at the time of the vandalism, and the expected testimony of Kathleen Sanchez, that defendant had borrowed her SUV that day. The prosecution never called Sanchez as a witness. During his own trial testimony, however, defendant addressed this issue and admitted that he had borrowed that type of SUV on the day of the vandalism, but insisted that he only used the vehicle to conduct a

marijuana transaction. Thus, the jury heard confirmation for Castle's belief that defendant had borrowed a vehicle which matched the description of the suspect's vehicle. In addition, the jury received a limiting instruction about the vandalism evidence, that it could not consider the vandalism evidence as relevant to defendant's motive unless it found that the People had proved by a preponderance of the evidence that the defendant in fact committed the offenses.

Barnett held that the evidence about the destruction of the engine was relevant and probative because the witnesses filed a police report and attributed the damage to the defendant; the defendant was angry they had blamed him; and the defendant's anger was a motive for the murder. (Barnett, supra, 17 Cal.4th at p. 1120.) As with the police report in Barnett, the vandalism incident was relevant and probative in this case because it was the basis for the allegations in the restraining order. The entire situation could have ended with the restraining order. Instead, the conflict escalated as defendant repeatedly confronted Jackson and Castle — either in person or on the telephone — and expressed his fury and anger about being named in the restraining order, and that they had obtained the restraining order by alleging that defendant was responsible for the vandalism. Indeed, defendant held up the restraining order in his car when he confronted Jackson and Khalil at the intersection near Wal-Mart.

Moreover, the vandalism evidence "was no stronger and no more inflammatory" than the other admissible testimony about defendant's repeated threats and angry statements to Jackson; defendant's admission that he knowingly violated the restraining order on multiple occasions; his habit of confronting Jackson and Castle by stopping traffic in busy intersections; his purchase of a gun and billy club during this period; and the murder itself, committed in front of Jackson's 11-year-old son. (See, e.g., People v. Ewoldt (1994) 7 Cal.4th 380, 405.)

People v. White, 2013 Cal. App. Unpub. LEXIS 2670 at 48-52.

Petitioner has not made a showing of prejudice. First, no Supreme Court precedent has made clear that admission of irrelevant or overly prejudicial evidence can constitute a due process violation warranting habeas corpus relief. See Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) ("The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." (citation omitted)).

Even assuming that improper admission of evidence under some circumstances rises to the level of a due process violation, Petitioner has not shown he was prejudiced

28

by the evidence in this case. Petitioner's claim would fail even under Ninth Circuit precedent, pursuant to which an evidentiary ruling renders a trial so fundamentally unfair as to violate due process only if "there are *no* permissible inferences the jury may draw from the evidence." Windham v. Merkle, 163 F.3d 1092, 1102 (9th Cir 1998) (emphasis in original) (quoting Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991)). See also Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005) ("A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision."). Here, the testimony was relevant to showing Petitioner's animus towards Castle and the victim. There was significant additional evidence supporting the prosecution's theory that Petitioner was upset with Castle and victim, and the jury was provided a limiting instruction to only use the evidence for the specific purpose of showing motive. The admission of the evidence was harmless and did not have a substantial and injurious effect or influence in determining the jury's verdict.

For the reasons discussed above, the Court finds that Petitioner would not be successful in his claim regarding the improper admission of evidence. As the claim would not be successful, Petitioner is unable to show prejudice from counsel's failure to present the claim at trial. Petitioner's first claim is procedurally barred.

**B.    Claim Two: Admitting Evidence of Domestic Violence**

Petitioner next contends the trial court violated his due process rights by admitting irrelevant and unduly prejudicial evidence of his prior acts of domestic violence against Castle.

**1.    State Court Decision**

Petitioner presented this claim by way of direct appeal to the California Court of Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the appellate court and summarily denied in subsequent petition for review by the California Supreme Court. (See Lodged Docs. 1-6.) Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have

issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05, 111 S. Ct. 2590, 115 L. Ed. 2d 706 & n.3 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's rejection of petitioner's claims was contrary to or an unreasonable application of federal law under 28 U.S.C. § 2254(d)(1)).

In denying Petitioner's claim, the Fifth District Court of Appeal explained:

II. Admission of evidence about domestic violence

Defendant next contends the court committed prejudicial error when it permitted Castle to testify about the domestic violence incidents that occurred when she was living with defendant, and allowed the prosecution to introduce the testimony from the domestic violence expert. As in issue I, ante, defendant argues such testimony was irrelevant and prejudicial, constituted inadmissible character, evidence and violated his due process rights.

A. Background

The prosecution's pretrial motion sought to introduce Castle's testimony that defendant committed prior acts of domestic violence against her during their relationship. The prosecution argued such evidence was relevant and probative of defendant's motive and common scheme or plan to murder Jackson, because of defendant's anger that Castle left him for Jackson. The prosecution further argued that defendant murdered Jackson as the "culmination of a cycle of violence" that defendant inflicted on both Castle and Jackson.

Defendant objected to Castle's proposed testimony as inadmissible character evidence because defendant had not been charged with committing any offenses against Castle in this case. The prosecutor replied that the case involved an "escalating campaign of violence" against Castle and Jackson, and defendant murdered Jackson as "the ultimate act that he sought to commit" to punish Castle and Jackson for being in a relationship. The prosecutor offered to call a domestic violence expert to explain the cycle of violence and how it would affect a domestic violence victim's family and friends.

The court believed the domestic violence evidence was relevant and probative as to defendant's cycle of violence and threats against Castle, his resentment of Castle's relationship with Jackson, and his motive to murder Jackson. However, the court declined to admit the evidence unless the prosecution established a foundation through expert testimony about this domestic violence issue. Defendant objected to a domestic violence expert, but the court overruled the objection.

"THE COURT: ... I'll allow those [domestic violence] incidents because I think it is relevant as far as motive, but that would be subject to some type of foundation being laid as far as making them relevant to that issue based upon . . . [an] alleged relationship between Ms. Castle and [defendant]."

As summarized, ante, the prosecution called Detective Rios as the domestic violence expert, and Castle testified about defendant's acts of domestic violence during their relationship.

As noted in section I, ante, the jury received CALCRIM No. 375, a limiting instruction which addressed both the vandalism and domestic violence evidence, and that the jury could only consider the domestic violence evidence for motive.

B. <u>Motive</u>

As with the vandalism evidence, defendant contends the domestic violence testimony constituted inadmissible character evidence. However, the domestic violence evidence was properly admitted to establish motive pursuant to Evidence Code section 1101, subdivision (b), and not as inadmissible character evidence. (<u>People v. Page</u>, supra, 44 Cal.4th 1, 40.)

A similar evidentiary situation was addressed in <u>People v. Lewis</u> and <u>Oliver</u> (2006) 39 Cal.4th 970 (<u>Lewis</u>), where the court held that evidence of multiple uncharged domestic violence incidents, and threats to the family members of murder victims, was relevant and probative of the defendants' motives to commit first degree murder. <u>Lewis</u> held the trial court properly admitted these prior uncharged incidents because the evidence "permitted reasonable inferences about defendants' motive, identity, and opportunity to commit the charged crimes. The [trial] court stressed the close timing and similar nature of the acts, the relationship between the victims and defendants, defendants' familiarity with the victims' property, and defendants' access to the murder weapon." (<u>Id.</u> at p. 1001.) "The uncharged acts showed an escalating campaign to retaliate against [the victim] and her family for the marital breakup. This motive also suggested that defendants were the perpetrators, and that they intended and premeditated the victims' deaths. [Another incident] ... showed defendants had the means to commit the murders." (<u>Ibid.</u>) <u>Lewis</u> found the trial court did not abuse its discretion as to either relevance or prejudice, and the jury received the appropriate limiting instruction. (<u>Ibid.</u>)

In this case, the evidence of defendant's history of domestic violence and threats against Castle was highly relevant and probative of his motive to assault and murder Jackson and was not admitted as prejudicial character evidence. Indeed, murder has been described as " 'the ultimate form of domestic violence,' " and the culmination of a history of violence between a defendant and a domestic partner. (<u>See, e.g.</u>, <u>People v. Brown</u> (2011) 192 Cal.App.4th 1222, 1237; <u>People v. Younger</u> (2000) 84 Cal.App.4th 1360, 1384.)

<u>Lewis</u> explained the relevance and probative value of domestic violence evidence as the motive for the escalation of violence and retaliation against the abused partner's family. (<u>Lewis</u>, supra, 39 Cal.4th at

pp. 1000-1001.) Defendant continued his pattern of physical and emotional violence against Castle by extending that violence and anger toward Jackson, his friend and her new boyfriend. He repeatedly threatened Castle because of their separation, and his belief that she was responsible for his imminent eviction. He admittedly violated the restraining order by confronting Jackson in Khalil's presence, in a threatening manner, and complained about the restraining order and his relationship with Castle. Defendant's escalation of violence against Jackson was an extension of his anger at Castle. The evidence was admissible for his motive to kill Jackson, and the jury received the appropriate limiting instruction that such evidence was only admissible to prove motive and not defendant's bad character.

C. The expert's testimony and profile evidence

Defendant separately asserts that the testimony from Detective Rios, the prosecution's domestic violence expert, constituted inadmissible profile evidence and should have been excluded.

"'[E]xpert opinion testimony is admissible only if the subject matter of the testimony is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." [Citation.]'" (People v. Vang (2011) 52 Cal.4th 1038, 1044.) It is well recognized that expert testimony regarding domestic violence, battered women's syndrome, and the cycle of violence is admissible because it is sufficiently beyond common experience and "relevant to explain that it is common for people who have been physically and mentally abused to act in ways that may be difficult for a layperson to understand. [Citation.]" (People v. Riggs (2008) 44 Cal.4th 248, 293; see also People v. Brown (2004) 33 Cal.4th 892, 895-896, 905-907; People v. Humphrey (1996) 13 Cal.4th 1073, 1087-1088; People v. Williams (2000) 78 Cal.App.4th 1118, 1129.)

Expert testimony on these subjects is relevant to the credibility of the person who has been battered because it may assist the jury "'by dispelling many of the commonly held misconceptions about battered women.' [Citation.]" (People v. Humphrey, supra, 13 Cal.4th at p. 1087.)

In addition, a properly qualified expert may testify on domestic violence issues "when it is relevant to a contested issue at trial other than whether a criminal defendant committed charged acts of domestic violence. [Citations.]" (People v. Gadlin (2000) 78 Cal.App.4th 587, 592.) The testimony of Detective Rios, the prosecution's expert, was properly admitted to explain Castle's reaction to defendant's domestic violence, her decision to leave him and to ask Jackson to help her, defendant's continuing anger and threats toward Castle after she left him, and the extension of his anger and violence toward Jackson.

More importantly, Detective Rios's testimony did not amount to inadmissible profiling evidence against defendant. "A profile ordinarily constitutes a set of circumstances —some innocuous — characteristic of certain crimes or criminals, said to comprise a typical pattern of behavior. In profile testimony, the expert compares the behavior of the defendant to the pattern or profile and concludes the defendant fits the profile. [Citation.]" (People v. Prince (2007) 40 Cal.4th 1179, 1226.)

"Profile evidence is generally inadmissible to prove guilt." (People

v. Robbie (2001) 92 Cal.App.4th 1075, 1084 (Robbie).) "Profile evidence is objectionable when it is insufficiently probative because the conduct or matter that fits the profile is as consistent with innocence as guilt." (People v. Smith (2005) 35 Cal.4th 334, 358.)

However, "[n]ot all testimony concerning general patterns of criminal activity is 'profile' testimony. 'Profile evidence is a "point by point examination of profile characteristics" that enable[s] the investigator to justify pursuing the matter.' [Citation.]" (People v. Lopez (1994) 21 Cal.App.4th 1551, 1555.) "By contrast, background testimony is not 'profile' evidence and does not specifically address the guilt or innocence of the defendant. Instead, it enables the jury to understand other evidence that does address guilt or innocence. [Citations.]" (Id. at p. 1556.)

The disputed issue in this case was whether defendant was guilty of first degree premeditated murder or, according to his trial testimony, guilty of a lesser offense or not guilty because the gun accidentally discharged when Aguirre and defendant allegedly wrestled for control of it. The court properly permitted the prosecution to introduce evidence about the vandalism of Jackson's mobile home, the restraining order, and the prior domestic violence incidents, as relevant and probative of defendant's motive.

Detective Rios did not testify that defendant fit the profile of a first degree murderer, or tie the methodology of the perpetrators of domestic violence to whether defendant was guilty of first degree murder. Her response to the hypothetical questions did not amount to an opinion on defendant's guilt of first degree premeditated murder. Instead, she believed the situation was consistent with the perpetrator stalking the victim. Indeed, it was virtually undisputed that defendant repeatedly crossed paths with Castle and/or Jackson after Castle left him — he showed up at the house of Jackson's mother to confront Castle about living with Jackson; he repeatedly called and threatened Castle about leaving him and the eviction notice; he confronted Jackson in an intersection near Wal-Mart; and he refused to fight at the mini-mart. Defendant even admitted these incidents occurred and that he repeatedly violated the restraining order, but attempted to characterize them in a different light.

Defendant contends Detective Rios's testimony was identical to the type of profile evidence which was criticized in People v. Robbie, supra, 92 Cal.App.4th 1075. In that case, the defendant was charged with multiple sex offenses. A prosecution expert testified that many rapists use only minimal force, and described in detail a scenario in which the rapist is in effect acting as if he thinks of the sexual acts as consensual. (Id. at pp. 1082-1084.) The expert described behavior which matched the testimony of the alleged victim. The expert conceded that the same behavior would be consistent with a truly consensual encounter. Robbie characterized this evidence as inadmissible "profile evidence." "[The evidence] implies that criminals, and only criminals, act in a given way. In fact, certain behavior may be consistent with both innocent and illegal behavior, as the People's expert conceded here." (Id. at p. 1085.)

This case did not involve the situation which Robbie found objectionable. True "[p]rofile evidence" is "unfairly relied upon to affirmatively prove a defendant's guilt based on his match with the profile.

33

The jury is improperly invited to conclude that, because the defendant manifested some characteristics, he committed a crime." (<u>Robbie</u>, supra, 92 Cal.App.4th at pp. 1086-1087.) Detective Rios's testimony consisted of general background information relying on a hypothetical question that was based on the evidence; she did not testify to impermissible profile evidence.

In addition, Detective Rios's discussion of defendant's actual conduct did not constitute impermissible profiling evidence. The prosecutor asked Rios a hypothetical question about threatened violence against the new partner of a domestic violence victim. In the course of setting forth the hypothetical situation, the prosecutor referred Rios to the police reports about this case and asked Rios to assume similar facts. In doing so, the prosecutor did not translate Rios's testimony into profile evidence, but simply based the hypothetical question on the evidence in this case. "It is required, not prohibited, that hypothetical questions [to an expert witness] be based on the evidence. The questioner is not required to disguise the fact the questions are based on that evidence." (<u>Vang</u>, supra, 52 Cal.4th at p. 1041.) A prosecutor's hypothetical questions to an expert must be based "on what the evidence showed" the defendant in the case did, "not what someone else might have done." (<u>Id.</u> at p. 1046.) "A hypothetical question not based on the evidence is irrelevant and of no help to the jury." (<u>Ibid.</u>)

The prosecutor's hypothetical questions to Detective Rios, and Rios's testimony about domestic violence, were relevant and probative of defendant's motive and did not constitute inadmissible profile evidence.

<u>People v. White</u>, 2013 Cal. App. Unpub. LEXIS 2670 at 52-63.

### 3.  Analysis

To the extent that Petitioner contends that the domestic violence evidence should have been excluded pursuant to California state evidentiary law, his claim fails because habeas corpus will not lie to correct errors in the interpretation or application of state law. <u>Estelle v. McGuire</u>, 502 U.S. 62, 67, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991).

With respect to Petitioner's due process claim, the United States Supreme Court has held that habeas corpus relief should be granted where constitutional errors have rendered a trial fundamentally unfair. <u>Williams v. Taylor</u>, 529 U.S. 362, 375, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). As discussed with regard to Petitioner's first claim, no Supreme Court precedent has made clear that admission of irrelevant or overly prejudicial evidence can constitute a due process violation warranting habeas corpus relief. <u>See</u> <u>Holley v. Yarborough</u>, 568 F.3d at 1101.

Petitioner has not shown that in this case the improper admission of evidence

rose to the level of a due process violation under AEDPA. There are permissible inferences the jury could have drawn from the domestic abuse evidence, specifically regarding Petitioner's motive to harass and harm Castle and the victim. Petitioner's trial was not rendered fundamentally unfair in violation of due process based on the admission of the domestic violence evidence.

Upon a review of the record, this Court finds that the trial court's admission of the domestic violence would not have had a "substantial and injurious effect" on the verdict. Brecht, 507 U.S. at 623. See also Penry v. Johnson, 532 U.S. 782, 793-96, 121 S. Ct. 1910, 150 L. Ed. 2d 9 (2001). Here, there was overwhelming evidence of Petitioner's guilt, based on the testimony of several eye witnesses to the murder, including the victim's son. In light of the evidence as a whole, there is no reasonable probability the verdict would have been different if the evidence had been excluded. Petitioner is not entitled to federal habeas corpus relief on claim two.

### C.    Claim Three: Prosecutorial Misconduct

Petitioner, in his third claim, contends that the prosecutor committed misconduct during closing argument by arguing facts not in evidence.

### 1.    State Court Decision

Petitioner presented this claim by way of direct appeal to the California Court of Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the appellate court and summarily denied in subsequent petition for review by the California Supreme Court. (See Lodged Docs. 1-6.) Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst, 501 U.S. at 804-05.

With regard to the prosecutorial misconduct claim, the Court of Appeal said in its opinion:

III. Prosecutorial misconduct — Improper vouching/facts not in evidence

Defendant next contends the prosecutor committed prejudicial

misconduct during closing argument because he allegedly argued facts not in the evidence and invoked the prestige of his office. Defendant concedes that defense counsel did not object to any of these comments, and raises ineffective assistance of counsel as an alternative argument.

We will begin with the well-recognized legal principles implicated by defendant's prosecutorial misconduct arguments. We will then review the portions of closing argument cited by defendant, taken in context with the entirety of the prosecutor's argument, and find that the prosecutor did not commit misconduct and defense counsel's failure to object was not prejudicial.

A. Prosecutorial misconduct

"A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' [Citations.]" (People v. Cole (2004) 33 Cal.4th 1158, 1202 (Cole).)

"When the issue 'focuses on comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' [Citations.] Moreover, prosecutors 'have wide latitude to discuss and draw inferences from the evidence at trial,' and whether 'the inferences the prosecutor draws are reasonable is for the jury to decide.' [Citation.]" (Cole, supra, 33 Cal.4th 1158, 1202-1203.)

In reviewing claims of misconduct during closing argument, "we must view the statements in the context of the argument as a whole. [Citation.]" (Cole, supra, 33 Cal.4th 1158, 1203.) A prosecutor's argument "may be vigorous as long as it is a fair comment on the evidence, which can include reasonable inferences or deductions to be drawn therefrom." (People v. Harrison (2005) 35 Cal.4th 208, 244.) "A prosecutor may 'vigorously argue his case and is not limited to "Chesterfieldian politeness" ' [citation], and he may 'use appropriate epithets warranted by the evidence.' [Citations.]" (People v. Fosselman (1983) 33 Cal.3d 572, 580.)

"As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion — and on the same ground — the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]" (People v. Samayoa (1997) 15 Cal.4th 795, 841.)

Defendant concedes that defense counsel did not object to any of his alleged appellate claims of prosecutorial misconduct. In the alternative, defendant argues that his attorney was prejudicially ineffective for failing to object. "To establish ineffective assistance, defendant bears the burden of showing, first, that counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms. Second, a defendant must establish that, absent counsel's error, it is reasonably probable that the verdict would have been more favorable to

him. [Citations.]" (People v. Hawkins (1995) 10 Cal.4th 920, 940, overruled on other grounds in People v. Lasko (2000) 23 Cal.4th 101, 110 and People v. Blakeley (2000) 23 Cal.4th 82, 89.)

In light of defendant's claim of ineffective assistance of counsel, we will address the prosecutorial misconduct issues on the merits.

B. Vouching/facts outside of evidence

Defendant cites to three excerpts from the beginning of the prosecutor's lengthy closing argument, and argues the prosecutor cited to facts not in evidence and invoked the prestige of his office. "[I]t is misconduct for prosecutors to vouch for the strength of their cases by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it. [Citations.]" (People v. Huggins (2006) 38 Cal.4th 175, 206-207.) In addition, a prosecutor commits misconduct if he or she mischaracterizes or misstates the evidence, or refers to facts not in evidence. (People v. Hill (1998) 17 Cal.4th 800, 823, 827-828, overruled on other grounds in Price v. Superior Court (2001) 25 Cal.4th 1046, 1069, fn. 13.)

We have reviewed the entirety of the prosecutor's closing argument and determined that the prosecutor did not cite facts not in evidence or engage in improper vouching. Defendant cites to portions of the prosecutor's closing argument which occurred in the very beginning of his very broad opening sequence. The prosecutor explained that everyone who is charged with a crime and tried for that offense has certain constitutional rights, including the right to counsel, a jury trial, an impartial judge, the presumption of innocence, not being compelled to testify, the right to confront and cross-examine witnesses, receive discovery, have the court reporter take down the evidence, and call witnesses. The prosecutor stated that defendant's constitutional due process rights had been safeguarded during trial, and continued in this context:

"Understand that, every sh[r]ed of evidence that the prosecution has in this case was turned over to the defense prior to it being presented in court. Under the rules of discovery, not only must the prosecution turn over any information that we believe points to the guilt of the defendant, we must also turn over any evidence that could point to his innocence.

"Under our laws there are no Matlock, gotcha moments where Defendants are surprised by evidence they've never seen. Every police report, diagram, photograph, video, or audio recording, witness statements or expert statement was turned over to the defense. Through [defense counsel] the defendant has had the opportunity to examine, test, and challenge all of the People's evidence."

The prosecutor stated defendant's attorney helped select the jury, he was being tried before a jury of his peers, and the jury was part of the process to ensure he had a fair trial.

"*Make no mistake, the People of the State of California, the prosecution, [co-prosecutor] Ms. Silveira and I, have done*

*everything required of us under the law to protect the defendant's rights. Our job as prosecutors is to seek justice, not conviction. We have done everything possible to insure that this case has been tried according to the laws of this state and this nation.*

"Now, I make these points, because our respect for the rights of the defendant ... stand in stark contrast to the defendant's total lack of respect for the rights that Stephen Jackson possessed. Despite all we've done to safeguard the defendant's rights not only did he not respect Stephen Jackson's rights, he showed complete contempt for them.

"And believe it, Stephen Jackson had rights too. Stephen had the right to live without fear or worry of someone threatening him, someone threatening his girlfriend, someone threatening his young son as he went about his daily life. Stephen had the right to date a woman of his own choosing. He had the right to be secure in his own home. He had the right to expect [*70] that lawful orders of a court, restraining orders, would be respected and obeyed.

"... But this defendant whose rights we have zealously protected at every turn, couldn't have cared less about Stephen Jackson's rights...." (Italics added.)

Defendant cites the three italicized paragraphs out of context, and contends the prosecutor "in essence gave unsworn testimony that the prosecution had complied with its duty to turn over evidence to the defense. By asserting that he and Ms. Silveira had done everything required of them to protect the defendant's rights, he was both arguing facts outside of the evidence, and also invoking his own prestige and that of his office."

We disagree. During closing argument, a prosecutor " 'may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature.' [Citation.]" (<u>People v. Wharton</u> (1991) 53 Cal.3d 522, 567.) The prosecutor's general description of a criminal defendant's well-known constitutional and statutory rights — including the right to a neutral and detached magistrate, representation by counsel, trial by a jury of peers, and discovery of evidence — did not amount to citing facts not in evidence. It was not delivered to promote the prestige of the prosecutor's office, vouch for the integrity of prosecution witnesses, or refute any allegations of discovery violations.

The prosecutor instead sought to illustrate that defendants in all criminal prosecutions, including this case, are entitled to due process and the right to have a jury determine guilt, whereas defendant repeatedly ignored Jackson's right to peacefully live his life, and murdered him because he was upset that Castle and Jackson were living together.

The prosecutor's argument continued with a discussion of how defendant repeatedly violated the law in the months, weeks, and days leading to the murder of Jackson, and that his attempt to blame Aguirre for the homicide was not credible:

38

"Now, this drug-dealing, restraining order ignoring, abusive, dishonest, gun toting, two-time felon wants you to believe one of the most absurd stories you'll ever hear. We're confident that you don't."

As we have already noted, defense counsel did not object to any of these alleged instances of misconduct, and defendant has raised ineffective assistance as an alternate claim. "Failure to object rarely constitutes constitutionally ineffective legal representation [citation] ...." (People v. Boyette (2002) 29 Cal.4th 381, 424.) Moreover, "[i]f the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal. [Citation.]" (People v. Kraft (2000) 23 Cal.4th 978, 1068-1069.) Counsel may have decided not to object for the logical reason presented by the entirety of the argument — that the prosecutor was not committing misconduct when he discussed every criminal defendant's constitutional right to due process. We cannot find on this record that counsel's performance was deficient.

IV.  Prosecutorial misconduct; accusing defense counsel of fabricating a defense

Defendant next contends that the prosecutor committed misconduct during several portions of closing argument because he allegedly accused defense counsel of fabricating the "accident" defense, that the gun discharged because Aguirre wrestled with defendant for control of the weapon. Defendant argues the prosecutor also accused defense counsel of trying to prevent Aguirre from testifying. Defendant asserts that while the prosecutor could have argued that defendant himself fabricated the defense, the prosecutor instead "decided to launch an assault on defense counsel, repeatedly accusing [defendant's] legal team of unethical conduct."

As with defendant's allegations of misconduct addressed in issue III, ante, defense counsel did not object to any portion of the closing argument now being challenged on appeal. Defendant has again raised ineffective assistance as an alternative claim. In any event, the prosecutor did not commit misconduct and instead engaged in fair comment on the evidence that had been introduced to the jury without objection, regarding Aguirre's contacts with defense counsel, the prosecution's efforts to locate Aguirre, and defendant's trial testimony.

In order to reach this conclusion, however, we must examine the entirety of the trial record to illustrate that while the prosecutor's comments, taken out of context, might appear objectionable, he did not commit misconduct in his closing argument based on the nature of the defense theory and evidence presented to the jury.

A. Opening statement

On May 17, 2011, defendant's jury trial began with opening statements. Defense counsel, stated that the case was about a fight that "went too far, about emotion and passion," and that Jackson "pummeled" defendant during the fight. Defense counsel conceded that defendant

39

pulled a gun and fired two shots at Jackson. He did not claim that the shooting was an accident.

> "At the end of the trial, I suspect you'll be instructed on lesser crimes of murder and I will ask you to consider, consider finding that [defendant] is guilty of a lesser included crime, not murder, not that he intended to kill this man, *but that there was some sort of rage or passion or some sort of self-defense involved.*" (Italics added.)

B. <u>Defendant's trial testimony</u>

On Tuesday, May 24, 2011, defendant testified at trial and said that the homicide was an accident, and the gun went off twice because Aguirre wrestled with him for the weapon.

On the same day that defendant testified, the defense recalled Sergeant Rodney Court, the chief investigator. Court testified that Aguirre did not contact the police department during the investigation at the scene. Court later tracked down Aguirre and obtained a statement from him. The defense did not call Aguirre as a witness.

C. <u>The prosecution's request for further discovery</u>

On Wednesday, May 25, 2011, the day after defendant testified, the court granted the prosecution's motion for the defense to provide discovery of contact information for Ashley Brown, who had been living with Aguirre at the time of the homicide.

D. <u>Initial rebuttal evidence about efforts to locate Aguirre</u>

On Wednesday, May 25, 2011, the prosecution recalled Sergeant Court. Court testified that it was extremely difficult to find Aguirre because there were outstanding warrants for his arrest. Court finally found and interviewed Aguirre about four months after the homicide. Court did not try to find Aguirre prior to trial.

Sergeant Scott Skinner, another of the investigating officers, testified that he listened to defendant's trial testimony, and that was the first time that he had heard that Jackson was accidentally killed because Aguirre struggled with defendant for the gun. Skinner testified that immediately after defendant testified, the prosecutor asked Skinner to find Aguirre but the search was not successful.

E. <u>Additional rebuttal evidence about efforts to find Aguirre</u>

On the afternoon of Thursday, May 26, 2011, the trial resumed and the prosecutor recalled Sergeant Skinner. Skinner testified that on Wednesday evening, May 25, 2011, the prosecutor gave him additional information about Aguirre's possible whereabouts. Skinner assigned several officers to look for Aguirre on Wednesday night and Thursday morning. Skinner learned that Aguirre had been found a few hours earlier that afternoon.

F. <u>Aguirre's rebuttal testimony about the homicide</u>

Also on May 26, 2011, Aguirre appeared as the prosecution's rebuttal witness, and testified that he never touched the weapon, defendant fired both shots at Jackson, and he did not feel responsible for Jackson's death.

Defense counsel vigorously cross-examined Aguirre, asked if he was a "meth addict", and asked leading questions which assumed the truth of defendant's version of the shooting, that Aguirre wrestled with him for the gun and it discharged twice. Aguirre repeatedly became frustrated, insisted that he never touched the gun, and said that defense counsel was "trying to confuse me.... I'm telling you how it happened." This frustration culminated in the following exchange.

"[DEFENSE COUNSEL]: Sir, I'm not trying to trick you I just want [to] hear what you have to say.

"A. Oh, yes, you are. There ain't no trick to it."[fn18]

FN18: As we will discuss, *post*, defendant contends the prosecutor committed misconduct during closing argument when he addressed the nature of defense counsel's cross-examination questions to Aguirre.

G. Aguirre's rebuttal testimony about his contacts with the defense and prosecution

Also on rebuttal, Aguirre testified without objection about his contacts with the defense and prosecution.[fn19] Defendant's trial began on Tuesday, May 17, 2011. Aguirre testified that on Sunday, May 22, 2011, he was living in Visalia when he was contacted by Bob Gilbert, a defense investigator. Aguirre testified that he did not know that Gilbert worked for the defense because Gilbert "made it sound" like he was working for Stephen Jackson. Gilbert said he wanted to serve Aguirre with a subpoena, that Aguirre might have to testify about the shooting, and he would provide Aguirre with a ride. Aguirre replied that he did not want the police to serve him because he had outstanding warrants.

FN19: Defendant contends the prosecutor committed prejudicial misconduct during closing argument when he discussed Aguirre's contacts with the defense investigator, and the prosecution's efforts to find Aguirre after defendant's trial testimony. As we will discuss, *post*, the prosecutor's argument constituted fair commentary on the admissible evidence discussed herein.

Aguirre testified that Gilbert never called him again. However, Aguirre was later contacted by his former girlfriend, Ashley Brown, who was now living in Idaho. Brown advised Aguirre that he needed "to clear my name, something about the shooting." Brown gave the prosecutor's contact number to Aguirre.

As a result, Aguirre again called Gilbert because he didn't know who wanted to contact him. He left Gilbert a message about Brown's information and asked why he had to "clear my name." Gilbert did not return the call.

Aguirre testified that he again called Gilbert earlier that same day, May 26, 2011, and Gilbert did not call him back. Aguirre heard "they were

41

looking for me in Visalia and so I decided to call" the telephone number provided by Brown. Aguirre called the prosecutor for the first time around 12:30 p.m. that day, May 26, 2011. Aguirre learned that the prosecutor wanted to call him as a witness, but he was worried because of his outstanding warrants. The prosecutor told him that several officers were looking for him, and it would be better to voluntarily appear for the trial and deal with his legal problems. The prosecutor did not make any promises, but said he would "help me get them cited out" on a promise to appear so he could go home that night.

H. <u>Analysis of closing argument</u>

The preceding history of Aguirre's contacts with the prosecution and the defense places the prosecutor's closing argument and defendant's allegations of misconduct into context. Defendant contends the prosecutor accused defense counsel of fabricating the defense claim that Aguirre accidentally fired the fatal gunshots. Defendant cites to several lengthy segments of closing argument in support of this contention.

"It is generally improper for the prosecutor to accuse defense counsel of fabricating a defense [citations], or to imply that counsel is free to deceive the jury [citation]. Such attacks on counsel's credibility risk focusing the jury's attention on irrelevant matters and diverting the prosecution from its proper role of commenting on the evidence and drawing reasonable inferences therefrom. [Citations.]" (<u>People v. Bemore</u> (2000) 22 Cal.4th 809, 846 (<u>Bemore</u>).)

"Nevertheless, the prosecutor has wide latitude in describing the deficiencies in opposing counsel's tactics and factual account. [Citations.] In so doing, the prosecutor may highlight the discrepancies between counsel's opening statement and the evidence. [Citation.] Misconduct claims also have been rejected where the prosecutor anticipates the flaws likely to appear in counsel's closing argument based on evidence that was introduced [citation], and where the prosecutor criticizes the defense theory of the case because it lacks evidentiary support [citation]." (<u>Bemore</u>, supra, 22 Cal.4th at pp. 846.)

"It is not ... misconduct to ask the jury to believe the prosecution's version of events as drawn from the evidence. Closing argument in a criminal trial is nothing more than a request, albeit usually lengthy and presented in narrative form, to believe each party's interpretation, proved or logically inferred from the evidence, of the events that led to the trial. It is not misconduct for a party to make explicit what is implicit in every closing argument,..." (<u>People v. Huggins</u>, supra, 38 Cal.4th at p. 207.)

With these guidelines in mind, we turn to defendant's numerous citations to closing argument where the prosecutor allegedly accused defense counsel of fabricating the "accident" defense.

a. <u>"[S]uch a complete about face"</u>

Defendant first cites to a particular section of prosecutor's closing argument, where he allegedly began to attack defense counsel. In this section, the prosecutor cited defense counsel's opening statement, that defendant shot Jackson either because of imperfect self-defense or heat of passion. The prosecutor "emphasize[d]" that an attorney's opening

42

statement is not evidence but "a road map of where they believe the evidence will lead," and that defense counsel never used the word "accidental" in his opening statement. However, "three quarters of the way through this trial the defense stopped" and turned in the "exact opposition direction from where they had started.

> ""I expect that you were amazed ... as you listened to the **defendant tell us, with a straight face**, that the murder of Stephen was an accident.

> "And more than that ... not bear the slightest responsibility for. Zero. The real culprit and the death of Stephen Jackson, he said, was Benny Aguirre. That Benny Aguirre wrestled the gun the defendant was holding and then the struggle, not one, but two shots were fired, both striking poor Stephen Jackson, the first one dead center in his chest.

> "That, Ladies and Gentlemen, is the most bizarre preposterous and utterly unbelievable statement you likely will ever hear. Defense counsel never once suggested in his opening statement the killing of Stephen Jackson had been an accident. Nor did he blame Benny Aguirre for anything. Why? *Why you might be asking yourself did the defense do such a complete about face in their story? We wondered the same thing.*" (Italics and bold added.)

Defendant contends the italicized portion of the above paragraph is the first instance where the prosecutor argued that defense counsel and the defense team acted unethically and fabricated a defense.

These italicized statements must be taken in context with the argument bolded above, when the prosecutor clearly addressed defendant's trial claim that Jackson was accidentally shot because Aguirre struggled with him for the gun. In addition, a prosecutor may properly highlight discrepancies between defense counsel's opening statement, and the failure of the defense to introduce evidence or call logical witnesses. (People v. Brady (2010) 50 Cal.4th 547, 566.) In People v. Bemore, supra, 22 Cal.4th 809, defense counsel asserted in opening statement that the defendant did not wear size 13 shoes, and that a suspicious vehicle seen at the crime scene did not belong to the defendant. In closing argument, the prosecutor argued that both of defense counsel's assertions had been contradicted by several witnesses. On appeal, the defendant argued that the prosecutor's references to defense counsel's opening statement were improper because he was accusing counsel of dishonesty in presenting a defense. (Id. at p. 847.)

Bemore rejected this claim because the prosecutor accurately summarized the evidence which contradicted the defense counsel's assertions in opening statement. (Bemore, supra, 22 Cal.4th at p. 847.) "[T]he record supports the prosecutor's suggestion in closing argument that counsel could not reasonably adhere to prior claims concerning defendant's shoe size and car, and that incriminating evidence introduced at trial on both topics had undermined the defense's original theories." (Ibid.) Moreover, the prosecutor's specific references to defense counsel and his opening statement did not constitute misconduct:

"By referring to counsel in the first person and alluding to defenses not supported by the evidence, the prosecutor simply employed a rhetorical device calculated to focus the jury's attention on strong circumstantial evidence of guilt and on any corresponding weaknesses in the defense case. No improper attack on counsel's personal integrity or professional tactics could reasonably be gleaned from such remarks." (Ibid.)

As in Bemore, the prosecutor in this case contrasted defense counsel's opening statement that the homicide occurred either because of heat of passion or self defense, with defendant's trial testimony about an alleged accidental shooting. The prosecutor did not accuse defense counsel of fabricating the accident defense, but instead argued that defendant was lying when he testified about Aguirre's alleged responsibility for the homicide.

b. "[S]till on the self-defense track"

Defendant next cites to a few sentences within another lengthy portion of the closing argument which immediately follows the section cited above, as further indication that the prosecutor claimed defense counsel "was complicit in manufacturing an accident defense."

In this section, the prosecutor summarized the admissible evidence about Aguirre's contacts with the defense investigator, the defense investigator's failure to return his telephone calls, and the prosecution's efforts to find him after defendant testified, and then stated:

"Then it got very interesting. At some point after Sunday, after telling Benny Aguirre he would be a defense witness, *the defense apparently decided to gamble. Sensing that their self-defense strategy, the one that [defense counsel] had outlined for you in opening statement was going no where, they came up with a new fiction.* They, the defense ... knew where Benny Aguirre was, but they were willing to bet that the prosecution wouldn't be able to find him before the case went to you." (Italics added.)

Defendant contends the italicized language shows that the prosecutor accused defense counsel of fabricating a defense. However, the prosecutor relied on the admissible evidence about Aguirre's contacts with the prosecution and defense investigators, tied it together with defendant's surprising trial testimony that the shooting was an accident and caused by Aguirre, and then asked the jury to consider why the defense was not interested in calling Aguirre as a witness, since he would refute defendant's "accident" theory.

In considering these paragraphs in context with the entirety of the closing argument, the prosecutor used "defendant" and "defense" interchangeably. Misconduct claims have been rejected where "the prosecutor criticizes the defense theory of the case because it lacks evidentiary support [citation]." (Bemore, supra, 22 Cal.4th at p. 847.) In People v. Frye (1998) 18 Cal.4th 894 (overruled on other grounds in People v. Doolin (2009) 45 Cal.4th 390, 421), the prosecutor did not impugn defense counsel when he accused counsel of making an

44

"irresponsible" third party culpability claim, and describing the defense theory as " 'ludicrous' and 'a smoke screen.' " (<u>People v. Frye</u>, *supra*, at pp. 977-978.)

In this case, the prosecutor clearly tied his entire argument to his claim that defendant lied when he testified about the "accidental" shooting. The prosecutor never accused the defense attorney of suggesting, creating, fabricating, or perpetrating the "accident" story.

c. <u>"[S]elling" the accidental shooting defense</u>

Defendant next cites to several paragraphs, within a larger portion of closing argument, as further examples of misconduct and argues the prosecutor suggested that defense counsel presented the defense dishonestly or unethically.

As with his other challenges, his claims of misconduct are refuted when the paragraphs are considered within the entirety of the argument. The prosecutor used this section to again attack the credibility of defendant's trial testimony, that defendant "shock[ed]" everyone with "this ridiculous nonsensical lie" that Aguirre wrestled with him for the gun and fired the two gunshots. After defendant had testified, "[t]he last thing that the defense wanted was for Benny Aguirre to come in here and tell the truth." The prosecutor then said:

> "*It's one of the most cynical defense strategies I've ever seen, Ladies and Gentlemen. Nothing more than Russian Roulette with justice. We're gambling.* The simple truth is once the defense decided that the prosecution, they made up their mind, the prosecution won't be able to find Benny in time to contradict the defendant's new story and it will get to the jury before that can be done and all ever a sudden becomes what, the perfect fall guy. Somebody that you can blame it on and who isn't going to be able to come back and tell you it's a lie." (Italics and bold print added.)

Defendant contends that in the italicized portions, the prosecutor suggested defense counsel presented the defense dishonestly or unethically. As we have already explained, however, the prosecutor used "defendant" and "defense" interchangeably, and he repeatedly claimed that defendant lied when he claimed that Aguirre was responsible for Jackson's death. The prosecutor properly commented on the evidence before the jury about the defense investigator's failure to return Aguirre's calls, and the prosecutor's frantic efforts to find Aguirre after defendant testified and before the case went to the jury.

Our interpretation is supported by the prosecutor's closing argument which immediately follows the portions cited by defendant. The prosecutor argued that defendant took the stand "without batting an eye," he contradicted "every single thing his attorney told us that we would hear in this trial," and Aguirre was responsible for shooting Jackson. "[Defendant] wasn't angry. It wasn't rage or passion and it wasn't self-defense. I'm not telling you that, Ladies and Gentlemen, he told you that. He got on the stand and told you something that was diametrically opposed to what his attorney told you you would hear during this trial." The entirety of argument thus shows that the prosecutor tied his attacks

on the defense case directly to defendant's decision to testify and defendant's testimony that the shooting was an accident.

### d. "[A]brupt reversal" of the defense strategy

Defendant cites to another lengthy portion of closing argument as further evidence that the prosecutor accused defense counsel of fabricating his defense. The entirety of the argument again refutes his claims. The prosecutor began this section by again expressly attacking defendant's trial testimony that he wasn't angry at Jackson, he never fired the gun, and the homicide was Aguirre's fault. He continued:

"*This abrupt reversal in defense strategy calls to mind the old adage about not changing horses in the middle of the stream, but it really doesn't matter very much in this case because the self-defense fiction was almost as ridiculous as the whopper about the twice accidental discharge of the gun.*

"Ladies and Gentlemen, the District Attorney's Office represents the People. And there was no way in the world that [co-prosecutor] Ms. Silveira and I were going to allow this defendant **to blame his own cowardly conduct on a missing person**, on Benny Aguirre, whose absence they controlled. It was not going to happen. *I would never let that kind of a fiction be perpetrated on a jury.*

"We went into warp speed overdrive Tuesday afternoon with the Merced Police Department, Detective Sergeant Skinner, and we used every resource available to find Benny Aguirre and convince him to come to court before we rested our case. All that night, as you heard, people were looking for him. We were in a race. The next morning Detective Skinner ... told you he sent two people down there ... to find him.

"*The defense played games with justice*, Ladies and Gentlemen. Game of beat the clock, and they lost. Benito Aguirre called me at 12:40 yesterday, 20 minutes, as you'll recall, 20 minutes before we were supposed to come back in this courtroom and do closing argument. That's how close it came." (Italics added.)

Defendant argues the italicized argument again shows that the prosecutor was accusing defense counsel of fabrication. As demonstrated by the entirety of this section, particularly the bolded language which precedes the italicized statements, the prosecutor again tied his attacks to defendant's trial testimony. The prosecutor also properly commented on the evidence that had been introduced to the jury without objection.

Even if the prosecutor was commenting on defense counsel's tactical decisions, his argument did not constitute misconduct. For example, in People v. Medina (1995) 11 Cal.4th 694, the prosecutor did not demean defense counsel by arguing that " 'any experienced defense attorney can twist a little, poke a little, try to draw some speculation, try to get you to buy something ....' " (Id. at p. 759.) "To observe that an experienced defense counsel will attempt to 'twist' and 'poke' at the prosecution's case does not amount to a personal attack on counsel's

integrity. [Citations.]" (Ibid.)

In People v. Huggins, *supra*, 38 Cal.4th 175, the prosecutor engaged in fair comment on the evidence and did not demean defense counsel when he said that defense counsel had a " 'tough job, and he tried to smoke one past us,' and that counsel 'will admit only what he has to admit and no more. He will come in at the lowest price possible.' " (Id. at p. 207.)

In People v. Kennedy (2005) 36 Cal.4th 595 (reversed on other grounds in People v. Williams (2010) 49 Cal.4th 405, 459), the prosecutor did not commit misconduct when he said that defense counsel's " 'idea of blowin' smoke and roiling up the waters to try to confuse you is you put everybody else on trial.' " (People v. Kennedy, supra, at p. 626.) "It is not misconduct for a prosecutor to argue that the defense is attempting to confuse the jury," or for the prosecutor "to comment on the failure of the defense to introduce material evidence or to call witnesses. [Citation.]" (Id. at pp. 626-627.)

e. "[S]hake Benny from the truth"

Finally, defendant cites the following italicized section as another example of misconduct:

> "*Despite using every lawyer, bully tactic he knew, [defense counsel] could not shake Benny from the truth of what happened that day.* As I told you, Benny is no rocket scientist but you saw for yourself he is a pretty savvy guy, right. 'I'm not trying to trick you,' the defense counsel told Benny. Benny looked right back and him and said, 'Yeah, you are.'

> "Don't treat people as idiots because they don't wear a shirt and tie. *It was a pathetic attempt to manipulate the ends of justice and failed abysmal[ly].* We located the witness they bet we couldn't find and he told you what you knew Tuesday, that the defendant's story was a complete and total lie." (Italics added.)

As the prosecutor continued with this argument, however, he immediately cited to defendant's trial testimony, and that the jury heard defendant "say with unmistakable pride" that he was "quite the player" with his other girlfriends. The entirety of this argument again shows that the prosecutor's entire attack on the defense theory was based on his accusation that defendant lied in his testimony.

While the prosecutor commented on defense counsel's conduct, he cited to the actual exchange between Aguirre and defense counsel during cross-examination, when defense counsel asked Aguirre several leading questions based on defendant's trial testimony — that Aguirre had struggled with defendant for control of the gun. At one point, defense counsel told Aguirre that he was not trying to trick him, but Aguirre accused defense counsel of engaging in that very conduct and trying to confuse him. The prosecutor's argument constituted fair commentary on Aguirre's testimony and apparent frustration with cross-examination. The prosecutor's argument in this section was similar to the type of argument

47

found valid in <u>Frye</u>, <u>Medina</u>, <u>Huggins</u>, and <u>Kennedy</u>. It did not constitute misconduct.

f. Conclusion

We have rejected defendant's arguments that his convictions must be reversed because of certain aspects of the prosecutor's closing argument. In reaching this conclusion, we note that the general tenor of closing argument on both sides was heated, particularly regarding the discovery of Aguirre's whereabouts and the nature of his trial testimony. The prosecutor asserted the defense "played games with justice," claimed the defense was trying to perpetrate "a fiction" on the jury, and implied the defense attempted to prevent Aguirre from testifying. In turn, defense counsel asserted the prosecution did not originally call Aguirre as a witness because his observations did not "fit" the prosecution's theory of the case, and Aguirre "hightailed it" out of the area because he was involved in the shooting and trying to hide something. Defense counsel queried why the prosecution did not want the jurors to have "the full story."

Nevertheless, to the extent that the prosecutor committed misconduct, or defense counsel was ineffective for failing to object and request admonitions, we find any error is necessarily harmless and defendant was not prejudiced by any aspect of closing argument. It is not reasonably probable that a result more favorable to defendant would have occurred, given the overwhelming nature of the evidence and defendant's inherently incredible trial testimony.

<u>People v. White</u>, 2013 Cal. App. Unpub. LEXIS 2670 at 63-95.

**2.    Applicable Legal Principles**

A criminal defendant's due process rights are violated when a prosecutor's misconduct renders a trial fundamentally unfair. <u>Parker v. Matthews</u>, 132 S.Ct. 2148, 2153, 183 L. Ed. 2d 32 (2012) (per curiam); <u>Darden v. Wainwright</u>, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986). Claims of prosecutorial misconduct are reviewed "'on the merits, examining the entire proceedings to determine whether the prosecutor's [actions] so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" <u>Johnson v. Sublett</u>, 63 F.3d 926, 929 (9th Cir. 1995) (citation omitted); <u>see also</u> <u>Greer v. Miller</u>, 483 U.S. 756, 765, 107 S. Ct. 3102, 97 L. Ed. 2d 618 (1987); <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974); <u>Towery v. Schriro</u>, 641 F.3d 300, 306 (9th Cir. 2010). Relief on such claims is limited to cases in which the petitioner can establish that prosecutorial misconduct resulted in actual prejudice. <u>Darden</u>, 477 U.S. at 181-83. <u>See also</u> <u>Towery</u>, 641 F.3d at 307 ("When a state court has found a constitutional error to be harmless

1  beyond a reasonable doubt, a federal court may not grant habeas relief unless the state

2  court's determination is objectively unreasonable"). Prosecutorial misconduct violates

3  due process when it has a substantial and injurious effect or influence in determining the

4  jury's verdict. See Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996).

### 3.    Analysis

6      As described in great detail in the state court decision, Petitioner claims that the

7  prosecution's criticism of Petitioner's defense strategy (in claiming that Benny Aguirre

8  took the gun from Petitioner and shot the victim) was improper and prejudicial.

9      The California Court of Appeal examined Petitioner's prosecutorial misconduct

10  claims and determined that there was no prejudicial misconduct. The state court's

11  determination was not objectively unreasonable. See 28 U.S.C. § 2254(d). The state

12  court found no evidence that the prosecution cited to facts not in evidence. Further in his

13  federal petition, Petitioner does not provide any description of the facts that were

14  allegedly not in evidence. Upon review, the Court is unable to determine which, if any,

15  facts were not in evidence. The prosecution presented argument that Petitioner

16  presented conflicting defenses, claiming that Petitioner shot the victim in self-defense

17  and then claiming that Aguirre, a bystander, intervened in the fight and shot the victim.

18  This accurately reflected the record presented at trial. Further, the state court's

19  determination that the prosecution presented permissible argument that Petitioner's

20  defense changed and lacked credibility was proper. Lastly, the state court was not

21  unreasonable in dismissing Petitioner's claim that there was improper vouching.

22  Petitioner presented no facts supporting a claim that the prosecution improperly invoked

23  the prestige of the district attorney's office to persuade the jury.

24      Even if there was misconduct, and the state court was not unreasonable in

25  determining that the violation was not so unfair as to constitute a due process violation.

26  Towery v. Schriro, 641 F.3d 300, 306 (9th Cir. 2010). There was strong evidence from

27  several witnesses that Petitioner instigated a confrontation with the victim while armed

28  and resulted in Petitioner shooting the victim before fleeing the scene. The decision of

the state appellate court rejecting the claim of prosecutorial misconduct is not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Richter</u>, 131 S. Ct. at 786-87. Accordingly, Petitioner is not entitled to federal habeas relief on this claim.

**V.     Recommendation**

Accordingly, it is hereby recommended that the petition for a writ of habeas corpus be DENIED with prejudice.

This Findings and Recommendation is submitted to the assigned District Judge, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1).  Within thirty (30) days after being served with the Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 839 (9th Cir. 2014).


IT IS SO ORDERED.


Dated:   __April 14, 2017__          ____ /s/ _Michael J. Seng_

UNITED STATES MAGISTRATE JUDGE

50